George J. Meyer Manufacturing Company, Respondent, vs. Howard Brass & Copper Company, Appellant.*

*January 18—May 1, 1945.*

560

*Marvin L. Kohner* of Milwaukee, for the appellant.
*Eugene P. Meyer* of Milwaukee, for the respondent.

ROSENBERRY, C. J.   In a general way the illustration already given in the statement of facts applies to each of the nine hundred items considered by the court.   This action was begun upon the theory that because the plaintiff relied upon the correctness of prices and computations in the defendant's invoices in making payments, the plaintiff had paid overcharges in the sum of $10,306.08, which amount the plaintiff was entitled to recover on the ground of mistake of fact.

The case went to trial upon a bill of particulars furnished by the plaintiff showing the amount of overcharge claimed by it to be $10,306.08.   During the course of the trial the plaintiff amended the bill of particulars and lowered its claim to $8,652.41, and it subsequently reduced the amount of its claim to $8,266.34.

While the trial began on the theory that the plaintiff was entitled to relief in equity and to have the account restated on the ground that it had paid the amount claimed under a mistake of fact, during the course of the trial the court held that the action was an action at law for money had and received rather than an equity action to restate the account. Whether the action is one in equity or an action for money had and received is not material at this stage of the proceeding for the reason that the evidence appears to have come in without objection, at least no question is raised here in regard to it.

The trial court early in the course of the trial was apparently in doubt that there was a legal mistake involved but that there was involved a species of fraud practiced by the defendant which entitled the plaintiff to recover the overcharge paid to the defendant, in reliance on representations made by the defendant. This is indicated by the fact that in its fourth, sixth, twenty-first, and thirty-first findings the court found that the base price overcharges by the defendant were carefully planned and deliberately made for the purpose of obtaining a higher price for the goods delivered than the defendant was entitled to under the purchase orders of the plaintiff and the printed mill-price schedules. The substance of this finding is repeated in the others.

The court reached this conclusion in spite of the fact that at the opening of the trial the plaintiff stated that it made no claim of fraud or collusion. We have carefully examined the record and we find no evidence which supports the finding of the trial court as to fraud nor are we cited to any such evidence in the briefs of counsel. The only evidence from which the court could possibly draw an inference of fraud is that in a large number of instances the defendant delivered on a single purchase order material weighing less than two thousand pounds, which took the minimum discount when it might have delivered a greater quantity which would have entitled the plaintiff to a greater discount. Assuming that this is true,

when the manner in which the parties transacted this business is given consideration it is difficult to see how the trial court could draw such an inference. It is true, there were many deliveries in quantity less than two thousand pounds, to which the defendant applied the minimum discount. However, as already pointed out, there went with each of these deliveries an invoice stating the amount, unit price, and total. That the plaintiff did not rely upon the invoice is conclusively shown by what it did in the way of checking the invoices in every possible particular, including price. Nor is it shown that the defendant knew that the price schedule was subject to any other interpretation than the one the parties gave it. That the plaintiff relied upon check by its employees is conclusively shown by the testimony of Mr. Meyer, who says the statements would not have been paid if they were not approved.

It is considered that the evidence does not warrant even a suspicion of fraud to say nothing of the fact that it is not that kind of "clear, satisfactory and convincing" evidence necessary to sustain a charge of fraud. Each transaction was open and above board. Nothing was concealed from the plaintiff. When the purchasing agent of the plaintiff checked the invoice for price, he must have resorted to the same price schedule that the defendant applied. Furthermore, he must have applied it in the same way, otherwise he would not have reached the same result and he would not have approved the invoice as to price. This matter seems to have been entirely overlooked by the trial court. During the course of his fifteen years' experience, the purchasing agent must have checked many thousands of invoices coming from different sources, and the fact that his independent computation produced the same result as that of the defendant is strong evidence of a common understanding of the price schedule.

The court made a finding of mistake, apparently for good measure, because if there was, as the court found, fraudulent conduct on the part of the defendant, the plaintiff would have

a right of recovery if he relied upon false representations made by the defendant. Under such circumstances the finding of mistake would be of no consequence. The result reached by the trial court cannot be sustained in the absence of proof of fraudulent misrepresentation as to which it is considered the record is barren.

With respect to payment, the court found that the plaintiff paid—

"under a mistake of fact in that plaintiff believed the charges as made by the defendant to be correct; that such mistake was in large part induced by the methods used by defendant and that plaintiff had no reason to suspect that such charges were not correct and did not make such payments conscious of the mistake or with any intention to waive inquiry into the correctness of the same."

In view of the methods employed by the plaintiff in checking and rechecking the invoices as to quantity, quality, price, etc., the trial court was in error in holding that plaintiff paid the statements under a mistake of fact.

A consideration of the law of mistake as established by the decisions of this court indicates that the finding as to mistake is not sustained by the evidence. In *Kowalke v. Milwaukee E. R. & L. Co.* (1899) 103 Wis. 472, 476, 79 N. W. 762, the court said that it is difficult to formulate with accuracy a practical definition of mistake of fact. The court laid down the following principle:

"The most philosophical definition we have found is that presented by Pomeroy (Eq. Jur. sec. 839) : *'An unconscious ignorance or forgetfulness of the existence or nonexistence of a fact, past or present, material to the contract.'* This definition contains several elements, each of which, as above suggested, must be explained and qualified in its practical application. Thus, the ignorance must be unconscious; that is, not a mental state of conscious want of knowledge whether a fact which may or may not exist does so. . . . Where a party enters into a contract, ignorant of a fact, but meaning

to waive all inquiry into it, or waives an investigation after his attention has been called to it, he is not in mistake, in the legal sense. These limitations are predicated upon common experience, that, if people contract under such circumstances, they usually intend to abide the resolution either way of the known uncertainty, and have insisted on and received consideration for taking that chance."

This was quoted with approval in the case of *Meeme Mut. H. P. F. Ins. Co. v. Lorfeld* (1927), 194 Wis. 322, 216 N. W. 507.

This principle was applied to payments in the case of *Grand Trunk Western R. Co. v. Lahiff* (1935), 218 Wis. 457, 261 N. W. 11. In that case the plaintiff sought to recover money on the ground that it was paid under a mistake of fact. The mistake of fact related to the survivorship of William Lahiff, the husband of Selma Lahiff. After referring to *Kowalke v. Milwaukee E. R. & L. Co., supra,* and the definition given by Pomeroy, the court said (p. 461) :

"The court in that case proceeds to analyze this definition, and the first requisite is that the 'ignorance must be unconscious; that is, not a mental state of conscious want of knowledge whether a fact which may or may not exist does so.' In other words, where a person enters into a contract or makes a payment, consciously ignorant of a fact, but meaning to waive all inquiry into it, or waives an investigation after his attention has been called to it, he is not in mistake, in the legal sense. In such a situation it is the intention of the parties to accept the consequences of uncertainty."

As already stated, the statements rendered by the defendant after they had been checked were placed before the general manager, George J. Meyer, Jr., manager of the company, who was charged with the responsibility of signing the checks. He testified :

It was a regular procedure for me to call upon the purchasing department for explanation of any bills and statements in the course of my checking over and verifying invoices from time

to time. If there were too many invoices covering a certain commodity I would complain about it. If the price was questionable or the weight was questionable, it wouldn't only be the purchasing department that I would check with, it would be all the way down the line. . . . My dealings with the Howard Brass in purchases were only with our purchasing agent, Edward Kasch, during the period involved, and I questioned him several times as to the number of invoices covering the same commodity from the Howard Brass Company. He mentioned that we were covered by contract and that we were getting the proper price and that if the Howard Company wished to make deliveries as they saw fit at their convenience, we shouldn't worry, as long as we were getting the best price obtainable. Nor did Kasch mention to me whether or not the splitting up of deliveries into smaller quantities was affecting the price of material we had on order. When I called attention to the fact that there were repetitions of deliveries of the same types of materials during the half month's period that I was checking, he simply stated that we were covered by contract in getting the best price obtainable; and by contract I have in mind the form of purchase order which we transmitted to a source of supply and which they accepted. It was an offer and an acceptance which would make a contract as I understand it.

The inquiries which I made with respect to the Howard Company bills were not prompted by any suspicions on my part that the bills were not proper for at the time that I signed checks in payment of statements and invoices, I believed that the prices thereon stated were the best obtainable price for the quantity of material which I had on order, and if I had known that the price was not based on the quantity on order but instead on the quantity being delivered from time to time and that we were not obtaining the best quantity discounts, I would not have paid the bills that were before me. . . .

I regarded Kasch as an executive in his department and he was permitted to exercise his judgment with reference to how much and where to buy. . . . Mr. Kasch's official title was Purchasing Agent, and I consulted with him daily on the question of purchases. . . . I frequently questioned Kasch as to why there were so many invoices coming through from the Howard Company and I also questioned him about this 1¼" pipe.

In the light of the foregoing definition of mistake it cannot be said that when Mr. Meyer approved the statements and signed the checks he did so under a legal mistake of fact. While he had the matter up with Mr. Kasch many times and apparently had it in his mind at all times, he never raised any question as to the invoices with the defendant. Mr. Meyer was neither ignorant nor forgetful. He had all the knowledge or means of knowledge that the defendant company had and the plaintiff used the same price schedules and applied them in the same way that the defendant did.

Mr. Kasch, plaintiff's purchasing agent, testified that in his opinion the plaintiff received all of the usual and customary discounts to which it was entitled on all purchases made from the defendant. This is in addition to the fact that he approved each invoice except when away on account of illness when they were held awaiting his return. Kasch's approval of the invoices as to price bound the plaintiff just as much as his orders for goods or his issuance of a blanket order when accepted bound the plaintiff.

What the plaintiff discovered in the course of its investigation in the summer of 1938 was not a mistake on its part or a mistake on the part of the defendant but that the price schedules might be subject to a different interpretation than that placed upon them by the plaintiff and the defendant, which would result in a profit to the defendant in the amount of several thousand dollars. In making up its claim the plaintiff made no substantial changes in the invoices except the changes produced by the application of a different interpretation of the price schedules. Ignoring the fact that it had approved the interpretation placed upon the schedules by the defendant, the plaintiff proceeded to make up its claim against the defendant upon what it claimed was another and correct interpretation of the price schedules. According to the testimony of the expert, Hall, the plaintiff took the quantity covered by blanket orders as the base for ascertaining the rate of discount. This was contrary to the practice in the trade and the court

did not apply that interpretation in disposing of the case. The court by reason of the application of Mr. Hall's interpretation of the schedules cut down plaintiff's claim more than fifty per cent after it had itself reinterpreted the schedules in the light of expert testimony and reapplied them. The price schedule is not like one of the ten commandments, plain and unambiguous, subject to but one construction. It appears from the evidence in this case it is subject to different constructions depending upon circumstances. It may be honestly interpreted in various ways by different parties when applied to the same facts. Witness in this case the different interpretations by the plaintiff and the court.

Under the facts of this case the right of the plaintiff to recover does not depend upon mistake. The real controversy was stated by the plaintiff in its brief. The plaintiff says:

"The controversy between the parties with respect to the quantity price claim is centered about the interpretation to be placed upon the language contained in the quantity price provisions of the printed mill schedules."

We regard this as a correct statement of the real basis of the plaintiff's claim.

The quantity schedule is found in the book of price schedules under "terms of sale." It is as follows:

"The base prices apply to base quantities shown on printed quantity schedules, except as otherwise specifically provided. Reductions from and additions to such base prices, as shown on printed quantity schedules apply to single items ordered for complete shipment at one time to one destination.

"The term 'item' as herein used means that part of an order or specification covering one alloy, shape, diameter, gauge, width, temper and finish, if in coils only or in varying straight lengths only. Varying lengths of certain materials may be included in one item.

"Partial shipments properly identified against any item so ordered, in case of unavoidable failure of seller to ship the

complete item on the date specified by buyer, will be billed at the price which would have been applicable to the complete single item.

"The term 'single order basis' . . . means the amount contained in one order . . . for shipment at one time."

The plaintiff in its brief says: "It is upon the application of this provision as set forth in the preceding paragraph [paragraph relating to single order basis] that the entire controversy over plaintiff's quantity overcharge portion of the claim centers. The plaintiff contends that the language of the schedule is clear and that the amount contained in one order for shipment at one time controls the quantity pricing in this case. The schedules do not depend upon the manner in which shipment is in fact made but rather upon the form of the order itself.

"The defendant, on the other hand, contends that notwithstanding the provisions of the price schedules, it is the amount actually shipped at one time that governs irrespective of whether the order called for shipment at one time."

By the issuance and confirmation of the blanket order and the acceptance of the purchase orders by the defendant, these provisions in the price schedules in legal effect became terms of the contract between the parties. In order for the parties to do business, it was necessary for each of them to interpret the provisions of the price schedule. For four years the parties did business upon this basis to the extent, according to the allegations of the complaint, of $192,119.04 without any dispute between them as to the interpretation of the provisions of the price schedule. As already pointed out, it appears from the testimony that the plaintiff interpreted these provisions in applying invoices sent to it by the defendant just as the defendant did. It thus appears that the controversy is a matter of interpretation of the contract and not one of mistake by either party.

We come next to a consideration of the legal effect of the acceptance of the goods and the payment of the purchase price

in accordance with the invoices delivered to the plaintiff from time to time.

As we have already indicated, the price schedules were in effect a term of the contract. It is a general rule of law that in construing the terms of a contract where the terms are plain and unambiguous, it is the duty of the court to construe it as it stands even though the parties may have placed a different construction upon it, *Milwaukee County v. Badger Chair & Furn. Co.* (1936) 223 Wis. 118, 269 N. W. 659. Where, however, the terms of a contract are ambiguous and subject to different interpretations, another rule applies. Under such circumstances, the court ordinarily will place that interpretation upon the terms of the contract which the parties in the course of their dealings have adopted. That the price schedules were ambiguous appears to be conclusively established by the following facts : By applying the price schedules to identical invoices, the plaintiff and the defendant agreed as to the interpretation to be placed upon them. After the plaintiff had received the advice of a certified public accountant, who by the way had had no prior experience with price schedules governing transactions in brass and copper, the plaintiff first placed a different interpretation upon the schedules and by virtue of such interpretation claimed that it had been overcharged in the sum of $10,306.08, which sum by another application of the price schedule it reduced more than twenty per cent. The court then applied the price schedule in the light of expert evidence and cut the claim of the plaintiff more than fifty-six per cent. This indicates that the price schedules are not unambiguous. When the expert witness, Hall, was asked to check one of these invoices, he replied that he was unable to do so without further information although he had the invoice and the price schedule before him. So it appears that in some particulars the relation between buyer and seller is governed by considerations not appearing in the price schedule. Some of the considerations which Mr.

Hall said should be taken into account were how the material had been released and what the customer's wishes were in regard to accepting delivery of the material. As an illustration, he said:

"If you were to order from our company 100 lengths of 1¼″ pipe, and make no reference to the manner of delivery and we chose to make delivery of ten lengths at a time, we would allow the maximum discount based on the 100 lengths for such quantity. If, however, you should order of us the same quantity of the same commodity, the order providing for delivery 'as required' and you made known to us that you wanted deliveries of ten lengths at one time, then our prices would be based only on the ten lengths and I think that would have fallen into the fifteen per cent category at that time.

"Assuming the same order for the same type of commodity, the order specifying delivery within three weeks, and in a situation where, by virtue of the customs between you and us, I knew that you wanted ten lengths at a time delivered—then, if we delivered only ten lengths at a time because you wanted it that way—we would only give you a fifteen per cent discount. And that same thing would be true, irrespective of what the order said. What the order called for wouldn't have any bearing on the case at all unless it specified a price and if it specified a price, why then the customer would have to stipulate that the price covered certain quantities."

The contract being ambiguous with respect to price, we turn to a consideration of the law.

A leading case in this state upon the practical construction of a contract by the parties is *Janesville Cotton Mills v. Ford* (1892), 82 Wis. 416, 52 N. W. 764, in principle a case very much like the case at bar. The owners of a water power from time to time made several grants conveying the perpetual use of a specified number of "square inches of water" under a head of four feet or its equivalent under any other head. A controversy arose as to the meaning of the term "square inch of water." On one side it was claimed that a square inch of water had a definite, technical meaning among

water engineers and practical millmen from a time anterior to the making of the first conveyance. On behalf of the defendants, it was claimed that the term had no such definite technical meaning at any time,—certainly not in the early days of the water power in question and that the meaning of the term here used must be sought for and found by considering the circumstances and facts surrounding the various grants. After further outlining the controversy, the court said (pp. 426, 430):

"We must, then, seek elsewhere to ascertain the meaning of the words under consideration, as the words were of doubtful signification. . . .

"It is well settled that the practical construction placed by the parties in interest upon doubtful or ambiguous terms in a contract will exercise great and sometimes controlling influence in determining the construction, and such rule is founded upon manifestly just principles. . . .

"We have concluded in this case that the construction which the owners of the power for years placed upon the terms of their grants, it appearing that such construction is reasonable and definite, should and must prevail. We adopt the construction which the parties have adopted, the construction which admits of no doubt as to the amount of water called for, which can always be defined and ascertained with mathematical certainty, and which seems to do justice to all parties in interest, namely, the construction that a 'square inch of water,' as used in the deeds in this case, means what we have termed the 'theoretical square inch.' "

This case was followed by *Walsh v. Myers* (1896), 92 Wis. 397, 401, 66 N. W. 250, in which a contract for the purchase of lye cans to be furnished "as heretofore" and where up to the time of the making of the contract cans had been furnished under a previous agreement which did fix the price and cans were thereafter furnished without any new agreement as to price. The court said:

"And the fact that cans were furnished and paid for, without any new agreement fixing the price, down to the

time of the fire, May 8, 1891, is entitled to weight as a practical construction by the parties themselves of this provision of the contract."

In *Murray Hill Land Co. v. Milwaukee L., H. & T. Co.* (1901) 110 Wis. 555, 566, 86 N. W. 199, it was held that where a right of way had been granted to a railway company and the railway company had—

"laid its tracks upon the street, occupying about twenty feet in the center thereof, and operated the same for about four years, and until the company became insolvent and went into the hands of a receiver. Circumstances showing practical location could hardly be stronger. We entertain no doubt that by these facts the indefinite and ambiguous terms of the grant as to place and manner of use became limited and fixed."

In *Excelsior Wrapper Co. v. Messinger* (1903), 116 Wis. 549, 552, 555, 93 N. W. 459, the contract provided that one party should furnish the other "what . . . paper (same as has been furnished during the last twelve months)," at agreed prices, "to be taken as ordered." The seller partly performed. After some 38,000 pounds, which was more than the consumption of the previous year, had been shipped and received the buyer insisted that the true construction of this part of the contract was that the seller should furnish all the paper the contractor might need during the contract year. The buyer after notice and demand to the seller, bought paper in the open market for the unexpired portion of the term and brought action for damages. The court said (p. 554) :

"Another class of evidence which was offered in much volume was the subsequent dealings and correspondence of the parties under this contract, whence it appeared that persistently, from some time in October onward, the plaintiff categorically and unequivocally declared its understanding that the contract entitled it to all the paper which its business demanded, and that, if that were not furnished, it had the right to charge defendant for any necessary extra cost in

buying elsewhere. To the declaration of this claim, defendant offered no suggestion of denial or dissent until after there had been ordered and shipped some 38,000 pounds more than the entire consumption of the previous year, nor until some time in February, when, upon the claim that he had already shipped more than the entire shipments of the previous year, and therefore more than the contract amount, he refused to fill orders except at a higher price. The efficacy of declarations and conduct of parties to give practical construction to ambiguous expressions in their contracts has been often recognized, and, in a doubtful case, may well turn the scale in one direction or the other. [Citing.] We think this evidence entirely sufficient to sustain the conclusion of the circuit court that the parties intended, by the ambiguous expression above quoted, to declare their agreement that the defendant should furnish, at the price specified, such roll-rag paper as the plaintiff should need in its business from September 1, 1899, to September 1, 1900."

In *Jones v. Thomas* (1904), 120 Wis. 274, 279, 97 N. W. 950, a controversy arose as to the construction of an agreement for arbitration. The question was, what had been submitted to the arbitrators, the contract being in that respect ambiguous. The court said:

"That the parties themselves so treated the agreement is evidenced by the fact that they joined in fully presenting their matters of difference to the arbitrators, leaving the judgment undisturbed. That the arbitrators so treated the agreement is evidenced by the fact that they in effect held that the judgment was valid and provided that it should be discharged upon appellant's paying respondent a sum of money named by them. In short, the contract fairly admits of a construction that the judgment should abide the award of the arbitrators. It was apparently so construed by the parties themselves and by their chosen triers. That particular construction, under familiar rules, may well be deemed sufficient to incline the court to the same view, since it is perfectly reasonable and equitable. The construction to be put upon an ambiguous contract may properly be and is often ruled by the meaning

the parties thereto, in the execution thereof, attributed to the same." (Citing cases.)

The case of *Strayer v. Gimbel Bros.* (1920) 172 Wis. 76, 178 N. W. 241, is in point. In that case the plaintiff claimed that he was entitled to a commission on gross sales. The contract was as follows:

"Milwaukee, Jan. 16, 1916.

"I have this day entered into a weekly engagement with Gimbel Brothers, at $30 each week drawing account, eight per cent basis, twenty per cent for repossessions. I have no other contract. No. 38.

"JOHN W. STRAYER."

Plaintiff had judgment in the trial court in the sum of $1,151.62. On appeal this court said (p. 78):

"The defendant contends that the court erred in not awarding judgment dismissing plaintiff's complaint upon the grounds that it is undisputed in this case that plaintiff throughout his employment accepted monthly statements from defendant showing that under the written contract he was entitled to a commission of eight per cent on net sales. It is undisputed that the monthly statements showing plaintiff's sales and what credits for repossessions were to be charged against his sales were received and accepted by him without objection. This long course of dealing between the parties is of controlling weight in determining the correct interpretation of the written agreement and must be accepted by the court as its correct interpretation by the parties. Such conduct is binding on plaintiff under the facts and circumstances of the case."

See also the following cases: *Walsh v. Myers* (1896), 92 Wis. 397, 66 N. W. 250; *Burton v. Douglass* (1909), 141 Wis. 110, 123 N. W. 631; *Pictorial Paper Pkg. Corp. v. Swamp & D. Labs.* (1938) 197 Ark. 287, 122 S. W. (2d) 529, 119 A. L. R. 1491; *Gearns v. Commercial Cable Co.* (1944) 293 N. Y. 105, 56 N. E. (2d) 67, 153 A. L. R. 813; *Windsor Mfg. Co. v. S. Makransky & Sons* (1936),

322 Pa. 466, 186 Atl. 84, 105 A. L. R. 1096. See cases cited 4 Page, Contracts, p. 3510, sec. 2034.

The practical construction placed upon the price schedules by the parties must be given great weight. Here eighteen successive contracts were made by the giving and acceptance of blanket orders. In the performance of each one of these contracts, the parties agreed perfectly as appears from the record upon the application of the price schedules to the purchase orders. Although the question was raised many times within the plaintiff organization, and was given careful consideration, no objection was ever lodged by the plaintiff with the defendant. Under these circumstances, the defendant had a right to rely upon the course of dealing between the parties and the parties were bound by it.

Upon the facts and the law we reach the conclusion that the plaintiff by interpreting the price schedules as it did over this period, manifested to the defendant that it accepted the goods and paid for them in accordance with the terms of the invoices; that the interpretation placed upon the price schedule by the course of dealing became in legal effect a part of the contract and bound the parties in accordance with the interpretation placed upon the terms of the contracts to the extent of all goods delivered under it. The plaintiff was not thereafter at liberty to disavow the contract as interpreted by the parties and recover from the defendant sums which it had voluntarily paid to it.

It is obvious that a course of dealing between the parties which results in a binding construction or interpretation of their contracts is a species of estoppel. The trial court held that estoppel not having been pleaded by the defendant, it could not rely upon it during the course of the trial. In so holding, it is considered that the trial court was in error. From an early day it has been held that whenever the matter of estoppel is apparent upon the face of the record, advantage may be taken thereof by demurrer as well as by plea.

*McFarland v. Rogers* (1853), 1 Wis. *452; *Brogan v. State* (1934), 214 Wis. 313, 252 N. W. 566.

Where the facts showing estoppel are in issue and a part of the case made by the pleadings, and the evidence showing estoppel is admissible for any purpose under the pleading, estoppel is available as a defense without being specially pleaded. *Lawton v. Racine* (1909), 137 Wis. 593, 119 N. W. 331; *Karlen v. Trickel* (1926), 189 Wis. 148, 207 N. W. 273; *Bank of Antigo v. Ryan* (1899), 105 Wis. 37, 80 N. W. 440.

In this case all the facts out of which the estoppel arose were put in evidence by the plaintiff and apparently without objection. Under such circumstances the court might properly have applied the doctrine of practical construction by the parties to the facts in this case.

The plaintiff further argues that there has been no change of position on the part of the defendant and therefore the doctrine of estoppel cannot apply. As will be seen from a consideration of the cases already cited, the practical construction of a contract by the parties is given weight even though there is no other change of position by the defendant than that the other party relied thereon. Here, however, this element of estoppel is present. The defendant quite obviously relied in making the eighteen successive contracts upon the interpretation placed upon the price schedules by the plaintiff during the course of dealings between the parties. While the plaintiff claimed in its complaint that the defendant was enriched in a sum exceeding $10,000, the defendant on the other hand claims that the so-called enrichment was a part of its legitimate profit; that if discounts were to be computed as now claimed by the plaintiff, the defendant might have ordered goods in large quantities from the mills shipped directly to the plaintiff, taken its twelve and one-half per cent profit as a jobber without any expense except bookkeeping.

It is to be borne in mind at all times in the consideration of this case that this is not a case where the plaintiff was an uninformed purchaser dealing with an expert in a class of goods about which the purchaser knew nothing. This is a case where two experts were dealing with each other at arm's length. This fact must be considered in any determination made as to the rights of the parties. Nor is this a single transaction in a matter about which the plaintiff was ignorant. The plaintiff had all the knowledge and all the means of knowledge that the defendant had. There is not a scrap of evidence in this case which indicates that the defendant had any different idea in reference to the construction of the price schedules than did the plaintiff, despite the finding of the trial court that the defendant deliberately designed to deceive the plaintiff. The evidence is that the defendant invoiced brass and copper products to plaintiff just as it did to other customers.

Upon the facts and the law, we reach the conclusion that by interpreting the price schedule as plaintiff did over a period of three years, covering eighteen separate contracts, it manifested to the defendant that it accepted the goods and paid for them in accordance with the terms of the invoices; that the interpretation placed upon the price schedules by this course of dealing became in legal effect a part of the contract and bound the parties in accordance with the interpretation placed upon the contract to the extent of all goods delivered under it. The plaintiff was not thereafter at liberty to disavow the contract and it cannot recover from the defendant any part of the sums thus voluntarily paid by it.

In this case it is held: (1) The plaintiff did not pay the statements sent to it by the defendant under a legal mistake of fact. In making payment it relied upon the check made by its employees without whose approval no payment would have been made.

(2) Over the three-year period there was practically no difference of opinion between the plaintiff and defendant as to the interpretation and application of the price schedules.

(3) It appears without dispute from the evidence that the price schedules cannot be applied to invoices without taking into consideration the circumstances and course of dealing between the parties.

(4) The defendant was not guilty of designedly or innocently misleading the plaintiff.

(5) The parties having placed a practical construction upon their contract and adhered to it for over three years in the transaction of more than $190,000 of business are bound thereby.

(6) The plaintiff paid the statements rendered to it by the defendant voluntarily with full knowledge or means of knowledge at hand of all material facts.

Because of the nature of the case and the character of the findings we have been obliged to quote extensively from the testimony of the plaintiff's witnesses. The trial occupied twenty-three days, the record consists of over two thousand pages, the appendices occupy about nine hundred pages, and briefs of counsel something over three hundred fifty pages. We have endeavored to state the case as briefly as possible. A number of collateral issues were presented to the trial court which need not be considered here in view of the conclusion we have reached.

*By the Court.*—The judgment appealed from is reversed, and the cause is remanded to the trial court with directions to enter judgment, (1) dismissing the plaintiff's complaint; and (2) awarding the defendant judgment against the plaintiff for the stipulated amount due it.

WICKHEM, J. (*dissenting*). I will do no more than state in barest outline the reasons why I disagree with the determination of the majority in this case. I am of the view:

(1) That the defendant allowed plaintiff a smaller discount than the purchase orders clearly called for;

(2) That through negligence on the part of employees of plaintiff, this mistake was not discovered;

(3) That there were overpayments by plaintiff aggregating the sum of these disallowed discounts;

(4) That plaintiff has made a case of money paid out by mistake. Mistake of fact was defined in the recent case of *Grand Trunk Western R. Co. v. Lahiff*, 218 Wis. 457, 261 N. W. 11. The court there adopted Mr. Pomeroy's definition. See Pomeroy, Eq. Jur. sec. 839:

"An unconscious ignorance of forgetfulness of the existence or nonexistence of a fact, past or present, material to the contract."

It appears to me that the facts of this case fall within the definition. Plaintiff did not, conscious of its ignorance, pay the bills with the intention of waiving all inquiry into or investigation of the facts.

As I read the evidence, what happened in this case was that the purchasing agent, either through carelessness, lack of familiarity with or misinterpretation of the plain provisions of the purchase orders approved the bills as to their price and discount features, and that the paying officer relied upon the checkup of the subordinate and issued checks in accordance with the bills and on the assumption of their correctness. It seems to me that it needs no extended discussion to establish that this was negligence, but it seems to me that there was also an "unconscious ignorance" of the facts. I think it will not do to relegate this mistake to the field of law because if I am correct concerning the purchase orders the matter of conforming to them did not involve the application of legal principles of construction. The mistake was mutual because, giving to defendant the assumptions of innocence and good faith to which it is entitled, it rendered the bills as a result of mistaken application of the provisions of the contract. As pointed out in *Grand Trunk Western R. Co. v. Lahiff, supra,* the fact that plaintiff's ignorance was the result of its negligence is not material, at least unless defendant has so changed its position because of plaintiff's negligent conduct as to make

it inequitable at this time to grant relief to plaintiff. See Restatement, Restitution, sec. 59. I discover no evidence of a change of position on defendant's part and, furthermore, defendant's erroneous billing contributed as substantially to plaintiff's mistake as did the latter's negligence.

The contention that there was an account stated should, I think, be rejected. The contention is based on the following cases: *Hawley v. Harran,* 79 Wis. 379, 48 N. W. 676; *Preston v. La Belle View Corp.* 192 Wis. 168, 212 N. W. 286; *Jones v. De Muth,* 137 Wis. 120, 118 N. W. 542; and *Ripley v. Sage L. & I. Co.* 138 Wis. 304, 119 N. W. 108. Defendant correctly states the doctrine of these cases to be that where parties have had mutual dealings and one renders to the other a statement purporting to set forth all the items of indebtedness on the one side and credits on the other, and the account so rendered is not objected to within a reasonable time, it becomes an account stated and cannot afterwards be impeached *except for fraud and mistake.* This case, of course, does not involve suit upon an unpaid statement of an account which has stood without objection for an unreasonable period of time. In this case there were prompt payments of the account in due course of business and the attempt here is to recover money paid under mistake of fact. In no instance did the account stand for such a long period of time as to put it beyond dispute. Furthermore, an account stated may be impeached in any case for mistake and even if this were a case of account stated, the mistakes which I have heretofore set forth, would be sufficient to impeach it.

However, it seems to me that the doctrine of account stated cannot be injected into cases where there has been a prompt payment under mistake of fact without destroying the whole doctrine of payment under mistake.

For the foregoing reasons I think the judgment should be affirmed.

I am authorized to state that Mr. Justice FAIRCHILD concurs in this opinion.