Charles P. SCHALLER and Daniel E. Arndt, d/b/a S.P.A. Associate Builders, a Wisconsin General Partnership, Plaintiffs-Appellants,

v.

MARINE NATIONAL BANK OF NEENAH, a National Banking Corporation, Defendant-Respondent.

Court of Appeals

*No. 85–1331. Submitted on briefs February 6, 1986.— Decided April 2, 1986.*

(Also reported in 388 N.W.2d 645.)

† Petition to review denied.

For the plaintiffs-appellants, the cause was submitted on the briefs of *Randall L. Nash* and *Michael J. Jassak* of *Habush, Habush & Davis* of Milwaukee.

For the defendant-respondent, the cause was submitted on the briefs of *David E. Leichtfuss* and *Susan R. Robertson* of *Michael, Best & Friedrich* of Milwaukee.

Before Scott, C.J., Brown, P.J., and Nettesheim, J.

BROWN, P.J.   Charles P. Schaller and Daniel E. Arndt, doing business as S.P.A. Associate Builders (SPA), appeal from the summary judgment granted to Marine National Bank of Neenah, dismissing SPA's amended complaint. At issue is whether a course of dealing between the parties, in which the bank had always either honored SPA's overdrafts or called SPA before dishonoring checks to allow SPA the opportunity to cover the overdrafts, created a prospective obligation either to act similarly or to give SPA prior notice that it would no longer do so. We conclude that no such legal obligation arose and affirm the judgment.

SPA, a partnership engaged in the business of constructing and selling residential and commercial properties, maintained its principal business checking account at Marine Bank from October 1977 until October 1984. During that period, SPA deposited millions of dollars into its account and wrote thousands of checks.

SPA's account was overdrawn thirty-six times between October 1977 and the end of August 1984 and,

on each occasion, the bank honored the overdraft. In some instances, the bank honored the overdrafts without contacting SPA. On other occasions, when insufficient funds were on deposit in SPA's account to cover checks presented, a bank officer called SPA to ask if a deposit would be made. Upon receiving assurance of a covering deposit, the bank honored the checks.

Sixteen of the overdrafts occurred before February 1984, eleven in amounts less than $650. From February 1984 to August 31, 1984, twenty overdrafts occurred, fifteen in amounts exceeding $10,000 and seven of those exceeding $30,000.

On September 4, 1984, checks were presented for payment which created an overdraft of approximately $143,000 from SPA's account. The bank officer assigned to SPA's account was on vacation. On September 5, the bank's president and its senior loan officer decided not to honor the three largest checks. A dispute exists as to whether the bank notified SPA of the overdraft and its decision to return checks. SPA claims it received no such notice and that, had it been notified, it would have made deposits to cover the checks. In September, the bank dishonored checks totaling approximately $635,000 because of insufficient or uncollected funds.[1] SPA further claims that as of September 5, the bank had never indicated it would not permit future overdrafts.

SPA brought this action alleging that the bank's conduct on and after September 5 seriously injured SPA's credit, reputation and standing in the business community, caused third parties to withdraw lines of

---

[1] It is undisputed that the bank did not dishonor checks drawn on uncollected funds until after notifying SPA that it would thereafter do so.

credit previously offered to SPA, and resulted in business losses to SPA of over thirty million dollars. SPA did not claim that an express oral or written agreement required the bank to honor, or to provide notice before dishonoring, SPA's overdrafts. Rather, SPA claimed that because of the prior course of dealing between the parties, the bank had a legal obligation, arising out of implied contract, promissory estoppel or the duty of good faith, to honor the checks or to provide notice of the overdraft or of its intentions to dishonor.

The circuit court granted the bank's motion for summary judgment, ruling that the bank's past practice of giving notice to SPA was merely a bookkeeping courtesy and created no prospective obligation. SPA appeals.

In reviewing the grant of a motion for summary judgment, we must independently apply the standards of sec. 802.08(2), Stats., in the same manner as the trial court. *Kremers-Urban Co. v. American Employers Insurance Co.,* 119 Wis. 2d 722, 733, 351 N.W.2d 156, 162 (1984). We will reverse if the record shows material facts to be in dispute or if a legal issue was incorrectly decided. *Ogren v. Employers Reinsurance Corp.,* 119 Wis. 2d 379, 381, 350 N.W.2d 725, 727 (Ct. App. 1984).

The relationship between a bank and its depositor is grounded in contract. *Huber Glass Co. v. First National Bank,* 29 Wis. 2d 106, 108, 138 N.W.2d 157, 159 (1965). Every contract is subject to the laws of the state at the time it is written. *State ex rel. Building Owners & Managers Association v. Adamany,* 64 Wis. 2d 280, 294, 219 N.W.2d 274, 281 (1974). Absent an agreement of the parties to the contrary, the provisions of the Uni-

form Commercial Code governing bank deposits and collections are made express provisions of the depositor's contract with the bank. *See* sec. 404.103, Stats.; *see also Cairo Cooperative Exchange v. First National Bank,* 620 P.2d 805, 809–10 (Kan. 1980).

When a customer deposits money with a bank, a creditor-debtor relationship is established. *Wisconsin Bankers Association v. Mutual Savings & Loan Association,* 87 Wis. 2d 470, 493, 275 N.W.2d 130, 138 (Ct. App. 1978), *reversed on other grounds,* 96 Wis. 2d 438, 291 N.W.2d 869 (1980); *Ma v. Community Bank,* 494 F. Supp. 252, 256 (E.D. Wis. 1980), *modified,* 686 F.2d 459 (7th Cir. 1982). To the extent that overdrafts are allowed, that relationship is reversed; by honoring an overdraft, the bank makes an unsecured loan to the customer. *Pulaski State Bank v. Kalbe,* 122 Wis. 2d 663, 665–66, 364 N.W.2d 162, 163 (Ct. App. 1985); *see also* 5B *Michie on Banks and Banking* § 301 (1973). For that reason, a bank need not honor overdrafts in the absence of an agreement to do so; whether or not to honor a check creating an overdraft but otherwise properly payable is a matter of discretion for the bank. Secs. 404.401(1) and 404.104(1)(i), Stats.; *see also* sec. 404.109(2), Stats. *Pulaski State Bank* at 665, 364 N.W.2d at 163; *see also Modoc Meat & Cattle Co. v. First State Bank,* 532 P.2d 21, 25 (Or. 1975); *Brady on Bank Checks* § 17.2 (5th ed. 1979). The bank's decision to pay or not pay overdrafts is a business decision turning on factors such as the size of the overdraft and the bank's view of its customer. *See* White & Summers, *Handbook of the Law Under the Uniform Commercial Code* § 17-3 at 661 (2d ed. 1980).

This rule under the UCC is consistent with pre-Code banking law. Article 4 (ch. 404, Stats.) and the rest of the Code do not purport to change the relationship between a bank and its depositor; relevant pre-Code law continues to govern that relationship. *See* R. Anderson, *Uniform Commercial Code* § 4–401:5, :6 at 138 (3rd ed. 1985).

It is long-standing banking law that, absent an agreement to contrary effect, a bank retains its discretion to dishonor checks creating an overdraft even when it has previously honored overdrafts for the customer. *See, e.g., Schoonmaker v. Gilmore,* 84 Ill. App. 17, 31 B.L.J. 140 (1899); *Canal Bank & Trust Co. v. Denny,* 135 So. 376 (La. 1931); *Discount Auto Mart, Inc. v. Bank of North Carolina,* 263 S.E.2d 41, 42 (N.C. Ct. App. 1980); *Brady on Bank Checks* § 17.2 (5th ed. 1979). As the Louisiana Supreme Court stated in *Canal Bank & Trust* at 377:

> A man may allow credit to another, if he see fit to do so, but this does not oblige him to extend that credit at any and all times thereafter. The banker, like the butcher, the baker, and the grocer, extends credit when he thinks the customer is good for the amount of the credit, but he shuts it off when he thinks the customer is no longer able to respond to his obligations . . . .

Similarly, "[b]ecause a bank often lets good customers overdraw, the latter do not thereby acquire the right to do so when the bank deems it improper to permit it." 5B *Michie on Banks and Banking* § 303 (1973). Each time a customer seeks to make a withdrawal creating an overdraft, the bank is entitled to choose whether to stand on or waive its right to refuse to allow such a

withdrawal. This is equally true when the overdraft is due to uncollected, rather than insufficient, funds. *See Discount Auto Mart* at 42.

■

Since a bank is not obliged to honor a check drawn on uncollected funds,[2] *a fortiori* it is not obliged, absent contrary agreement, to give its customer notice of a potential overdraft and honor the check upon receiving assurance of a forthcoming deposit. *See Orlich v. Rubio Savings Bank,* 38 N.W.2d 622, 624 (Iowa 1949).

■

Moreover, even if it is a bank's internal policy to respond in a particular way to an overdraft situation, no duty to follow such policies in every case arises in the absence of facts establishing a contract or estoppel. *See Lincoln National Bank & Trust Co. v. Peoples Trust Bank,* 379 N.E.2d 527, 529–30 (Ind. Ct. App. 1978); *Continental Bank v. Fitting,* 559 P.2d 218, 220 (Ariz. Ct. App. 1977).

We adopt these general rules governing depositor-bank relations. We now address whether an implied agreement to contrary effect could have arisen under the circumstances asserted by SPA.

---

[2] A non-cash deposit becomes available for withdrawal as of right only when final settlement is made for the item and a reasonable time for the bank to learn of the settlement has passed. Sec. 404.213(4)(a), Stats. Of course, a bank is free to give provisional credit for a deposit, retaining a right of charge-back if final settlement for the deposited item is not received. *See* sec. 404.212(1), Stats.

■

The essence of a contract implied in fact[3] is that it arises from an agreement circumstantially proved. *Theuerkauf v. Sutton,* 102 Wis. 2d 176, 184, 306 N.W.2d 651, 657 (1981). It requires, like an express contract, the element of mutual meeting of minds and of intention to contract; it is established by proof of circumstances from which the intention is implied as a matter of fact. *Id.* at 183–84, 306 N.W.2d at 657. Such circumstances may include the conduct of the parties. *California Wine Association v. Wisconsin Liquor Co.,* 20 Wis. 2d 110, 122, 121 N.W.2d 308, 315 (1963). But an implied contract must arise under circumstances which, "according to ordinary course of dealing and common understanding of men, show a mutual intention to contract." *Theuerkauf* at 185, 306 N.W.2d at 658, quoting *Gerovac v. Hribar Trucking, Inc.,* 43 Wis. 2d 328, 332, 168 N.W.2d 863, 865 (1969).

■

SPA asserts that an implied contract to provide a service to SPA arose because the bank had previously provided the service, though it never expressly promised or represented that it would do so.

---

[3] SPA's brief discusses both implied-in-fact and implied-in-law contracts. A contract implied in law, more commonly called a quasi-contract, is an obligation imposed by law without regard for the assent of the party bound; the obligation arises when the plaintiff has conferred a benefit on the defendant and it would be inequitable to allow the defendant to retain the benefit without paying for it. *Titus v. Polan,* 72 Wis. 2d 23, 25, 240 N.W.2d 420, 422 (1976); *Nelson v. Preston,* 262 Wis. 547, 549–50, 55 N.W.2d 918, 919 (1952). There being no allegation of unjust enrichment, the concept of quasi-contract is inapposite to this action.

We cannot accept SPA's argument. As discussed above, the bank has a statutory right, deemed to be incorporated into the parties' express contract, to decide whether or not to honor checks creating an overdraft. No express agreement between the parties here altered that right. The bank exercised its discretion in SPA's favor on a number of occasions. To assert that the bank thereby bound itself to do so in the future regardless of circumstances, or to give notice that it would not, is unreasonable. There is absolutely no commonsense inference that the bank intended to so bind itself.

The same rationale applies to the bank's practice of notifying SPA of overdrafts and honoring overdrafts on the assurance of a covering deposit. The bank had no statutory or common law obligation to so act, nor did an express agreement oblige it to do so. As a matter of law, we cannot construe the bank's previously offering such courtesies to SPA, without more, as evidence that it contracted to do so in future.

In so holding, we are rejecting SPA's argument that under UCC provisions applicable to banking a "course of dealing" of the kind described here may actually give rise to an agreement.

"Course of dealing" is defined in sec. 401.205, Stats., and made applicable to ch. 404, Stats., governing bank deposits and collections, by sec. 404.104(4), Stats. Section 401.205(1) defines a course of dealing as "a sequence of *previous* conduct between the parties to a particular transaction which is fairly to be regarded as establishing a common basis of understanding for *interpreting* their expressions and other conduct." (Emphasis added.) Section 401.205(3) provides that "[a] course of dealing between parties . . . give[s] particular meaning to and supplement[s] or qualif[ies] terms of an

agreement." Official UCC Comment 2 to Wis. Stat. Ann. § 401.205 (West 1964), states that "[c]ourse of dealing under subsection (1) is restricted, literally, to a sequence of conduct between the parties previous to the agreement."

Nothing in sec. 401.205, Stats., suggests that it speaks to contract formation; rather, sec. 401.205 establishes "course of dealing" as a tool for interpreting a contract whose existence is acknowledged.

It is undisputed that no course of dealing existed between the parties here before they entered into their express checking account agreement, which would modify or add terms to that agreement.

Although a "course of performance" under sec. 402.208, Stats., may aid in interpreting a previously existing contract, and may evidence a modification or waiver of its terms, sec. 402.208 relates specifically to ongoing sales contracts and is nowhere made applicable to banking relationships.[4]

We therefore hold as a matter of law that the bank's previous practice of honoring SPA's overdrafts or giving notice could not, alone, evidence an implied

---

[4] Article 2 (ch. 402, Stats.) of the Code, concerning sales, explicitly goes further than the rest of the Code in providing that contracts may be created and evidenced by the conduct of the parties. Commentators have noted that the Code "includes several innovative provisions on the formation of sales contracts, but it still leaves most issues of contract formation to general contract law." White & Summers, *Handbook of the Law Under the Uniform Commercial Code* § 2 at 6 (2d ed. 1980) (footnote omitted). The Code's special rules relating to sales contract formation are "specifically designed to meet mercantile problems and apply only to sales of goods; they do not displace common-law rules in such matters as contracts for personal services or for the sale of real property." *Wisconsin Uniform Commercial Code Handbook* § 1.01(3) (1971).

contract to do so at all times. The trial court correctly held there was no breach of an implied contract.

■

We next address whether the prior course of conduct between the parties could amount to a promise by the bank to give notice before dishonoring checks. SPA asserts that a jury could so find and therefore that summary judgment was inappropriate as to the issue of promissory estoppel.

The elements of promissory estoppel were set forth in *Hoffman v. Red Owl Stores, Inc.,* 26 Wis. 2d 683, 698, 133 N.W.2d 267, 275 (1965). They are: (1) Was the promise one which the promisor should reasonably expect to induce action or forbearance of a definite and substantial character on the part of the promisee? (2) Did the promise induce such action or forbearance? (3) Can injustice be avoided only by enforcement of the promise? *Id.* The first two elements present issues of fact ordinarily to be resolved by a jury, *see id.,* but we agree with the trial court that the bank's actions cannot be said to constitute a promise.

SPA has cited no case, and we are aware of none, in which the gratuitous performance of services by one party to a contractual relationship[5] for the other party was held to constitute a promise to provide those services in the future.[6]

---

[5] We do not address the bank's claim that promissory estoppel has no application to an existing contractual relationship, since we hold there to be no promise at all. *Cf. Kramer v. Alpine Valley Resort, Inc.,* 108 Wis. 2d 417, 423–26, 321 N.W.2d 293, 295–97 (1982).

[6] SPA does cite *George J. Meyer Manufacturing Co. v. Howard Brass & Copper Co.,* 246 Wis. 558, 18 N.W.2d 468 (1945), for the proposition that "a course of dealing between the parties which results in a binding construction or interpretation of their contracts

We therefore affirm the trial court's conclusion that, there being no promise to SPA, no promissory estoppel could arise.

We finally address whether the duty of good faith owed by the bank to SPA could have obliged it to notify SPA that it would no longer offer SPA the same courtesies it had in the past.

Every contract or duty within the UCC imposes an obligation of good faith in its performance or enforcement. Sec. 401.203, Stats. The issue of good faith is generally for the jury but may in a proper case be decided as a matter of law. *See* R. Eisenberg, *Good Faith Under the Uniform Commercial Code,* 54 Marq. L. Rev. 1, 15 (1971).

Section 401.201(19), Stats., defines good faith as "honesty in fact in the conduct or transaction concerned." Wisconsin Jury Instruction—Civil 3044 states, in addition to the above statutory language:

> The law implies a promise against arbitrary or unreasonable conduct. Good faith means . . . an honest intention to abstain from taking unfair advantage of another, through technicalities of law, by failure to provide information or to give notice, or by other activities which render the transaction unfair.

Good faith has also been characterized as "decency, fairness or reasonableness in performance or enforce-

---

is a species of estoppel." *Id.* at 580, 18 N.W.2d at 479. That case does not discuss promissory estoppel, and it deals with estoppel to disavow *past* performance. Further, we have already held that the course of dealing here did not result in a binding construction of the parties' contract. The cited case is thus not instructive on the issue presented here.

ment" of a contract. *See* R. Eisenberg at 9, quoting E. Farnsworth, *Good Faith Performance & Commercial Reasonableness Under the Uniform Commercial Code,* 30 U. Chi. L. Rev. 666, 668 (1963).

SPA seizes upon the reference to notice in Wis J I—Civil 3044. However, the instruction's mention of notice is not dispositive. The touchstone of good faith is honesty in fact and reasonableness.

SPA also cites a recent federal case holding that the obligation of good faith may have imposed upon the defendant bank a duty to give notice to the plaintiff before refusing to advance funds up to the credit limit under a credit line agreement. *See K.M.C. Co. v. Irving Trust Co.,* 757 F.2d 752, 759 (6th Cir. 1985).

In that case, there was an express financing agreement between the parties, and the loan sought from the bank was within the established credit limit. Moreover, a "blocked account" mechanism put K.M.C.'s continued existence "entirely at the whim or mercy of Irving," unless an obligation of good faith required "a period of notice to K.M.C. to allow it a reasonable opportunity to seek alternate financing . . . ." *Id.* at 759. Absent notification, K.M.C. had no means of self-protection.

In contrast, in the present case, SPA had no agreement with the bank allowing it to overdraw its account or obliging the bank to inform SPA of a potential overdraft. Additionally, SPA was not at the bank's mercy. All SPA needed to do to avoid possible loss resulting from returned checks was to monitor the status of its own account. Therefore, we do not find *K.M.C. Co.* to be dispositive.

■ We have held above that the bank did not impliedly contract or promise to honor SPA's overdrafts or to give SPA notice of potential overdrafts. Although the bank did in the past offer SPA such "bookkeeping courtesies," implicit in our holdings is that SPA could place no justifiable reliance in the bank's continuing to do so. The bank's previous conduct did not rise to the level of allowing SPA to assume it could write checks at will without the need to monitor the status of its account. SPA's pleadings and affidavit raise only a conclusory allegation that the bank knew or should have known the harm its actions would cause. Such an allegation does not create a substantial good faith issue under the circumstances of this case. We cannot see how the bank's decision to discontinue certain courtesies, even if it gave SPA no advance notice of that decision, constituted dishonesty or taking unfair advantage. While it may be the better practice to give such notice, we hold that the duty of good faith does not require it.

We therefore affirm the trial court's conclusion that the bank violated no duty of good faith.

Since the bank had no obligation to notify SPA before dishonoring checks, the parties' disagreement over whether the bank did give such notice does not constitute a dispute as to a material fact.

*By the Court.*—Judgment affirmed.