Lawrence THIELE, d/b/a Thiele Cattle Company, Plaintiff and Appellant,

v.

SECURITY STATE BANK OF NEW SALEM and Antone Goetz, Defendants and Appellees.

Civ. No. 11132.

Supreme Court of North Dakota.

Nov. 18, 1986.

Hoovestol Law Firm, Bismarck, for plaintiff and appellant; argued by Calvin Hoovestol, Bismarck.

Lindquist & Vennum, Minneapolis, Minn., and Wheeler, Wolf, Peterson, Schmitz, McDonald & Johnson, Bismarck, for defendants and appellees; argued by J. Michael Dady; appearance by Albert A. Wolf.

ERICKSTAD, Chief Justice.

Lawrence Thiele, d/b/a Thiele Cattle Company, appeals from a partial summary judgment [1] dismissing his wrongful dishonor claim against Security State Bank of New Salem and its president, Antone Goetz, and from an order denying his motion to vacate the partial summary judgment. We affirm.

Thiele commenced this action against the defendants alleging, inter alia, that from 1979 to 1984 the Bank paid his overdrafts with unsecured credit and loans consistent with a contractual agreement and pattern of dealing and custom and usage; that in July 1984 the Bank dishonored overdrafts in the amount of $510,693.33 without written or verbal notice; that the Bank's conduct was a breach of its actual and implied contract to provide credit and loans for his overdrafts and constituted a wrongful dishonor of those overdrafts; and that the defendants defamed him. The defendants answered, generally denying Thiele's allegations, and counterclaimed for damages for abuse of process and malicious prosecution.

After extensive discovery the defendants moved for partial summary judgment on Thiele's allegations that the Bank and Thiele had an actual or implied contract for the Bank to provide Thiele credit and that the Bank wrongfully dishonored Thiele's overdrafts. At the same time Thiele moved to amend his complaint to provide greater detail for the allegations of wrong-

ful dishonor; to add the defendants' attorney as a party to the defamation claim; and to include a claim for wrongful foreclosure. After a hearing on August 19, 1985, the district court continued Thiele's motion to amend the complaint and granted the defendants' motion for partial summary judgment. The district court concluded that there was no written or oral agreement requiring the Bank to pay Thiele's overdrafts and that the only written agreement between the parties specifically provided that the Bank was not obligated to pay Thiele's overdrafts regardless of the frequency with which it may have done so. The district court concluded, as a matter of law, that the Bank had no duty to honor Thiele's overdrafts and granted the defendants' motion for partial summary judgment.

Thiele subsequently moved for reconsideration of the partial summary judgment, and on December 2, 1985, the district court heard that motion along with Thiele's motion to amend the complaint. By order dated December 5, 1985, the district court declined to vacate the previously entered partial summary judgment. On December 19, 1985, Thiele appealed from the partial summary judgment and from the order refusing to vacate that judgment. On December 20, 1985, the district court granted Thiele's motion to amend the complaint and also denied motions for summary judgment dismissal of Thiele's defamation claim and the defendants' counterclaim. Thereafter, the district court judge recused himself from the case.

▮ Initially, Thiele contends that the district court reconsidered the issues decided by the partial summary judgment when it granted the motion to amend the complaint because, as he asserts, the amended complaint superseded the partial summary judgment. However, the record contains no indication that the district court reconsidered those issues when it granted the motion to amend the complaint. In fact,

---

1. The order for judgment contains "an express determination that there is no just reason for delay and ... an express direction for the entry of judgment." Rule 54(b), N.D.R.Civ.P.

the district court had previously denied a motion to vacate the partial summary judgment. A court may not consider a motion to amend a complaint following a judgment of dismissal unless the court first alters, vacates, or sets aside the judgment under Rules 59 or 60(b), N.D.R.Civ.P. *See Roque v. City of Redlands*, 79 F.R.D. 433 (C.D. Cal.1978); *see also* 3 Moore's Federal Practice, ¶ 15.10 (1985); 6 Wright & Miller, Federal Practice and Procedure: Civil § 1489 (1971). Moreover, the filing of a notice of appeal ordinarily divests the trial court of jurisdiction to rule on any matters from which that appeal is taken. *Buzzell v. Libi*, 340 N.W.2d 36 (N.D.1983); *Schmidt v. Schmidt*, 325 N.W.2d 230 (N.D.1982).

■ We conclude that the amended complaint did not reinstate the issues decided by the partial summary judgment because the district court had previously denied Thiele's motion to vacate and thereafter was divested of jurisdiction by the appeal from the partial summary judgment.

The determinative issue of this appeal is whether or not Thiele and the Bank had an actual or implied agreement for the Bank to provide an unlimited line of credit for the payment of Thiele's overdrafts without receiving assurances of repayment.

That issue must be resolved within the procedural framework of our rules for summary judgment. Summary judgment is a procedural device available for the prompt and expeditious disposition of a controversy without a trial if there is no dispute as to either the material facts or the inferences to be drawn from undisputed facts, or if only a question of law is involved. *Herman v. Magnuson*, 277 N.W.2d 445 (N.D.1979). If different factual inferences may be drawn, they must be drawn in favor of the party opposing summary judgment. *Sigurdson v. Lahr & Lahr, Inc.*, 299 N.W.2d 792 (N.D.1980). However, even if factual disputes exist between the parties, summary judgment is

appropriate if the law is such that the resolution of the factual dispute will not change the result. *Sande v. City of Grand Forks*, 269 N.W.2d 93 (N.D.1978).

Thiele asserts that there are disputed issues of material fact and inferences to be drawn from undisputed facts as to whether or not he had an oral agreement and mutual understanding with the Bank to pay his overdrafts. The Bank counters that Thiele did not present the district court with any admissible evidence demonstrating an oral agreement obligating it to pay Thiele's overdrafts.

■ In conjunction with whether or not there are disputed issues of material fact, we must consider the relationship between a bank and its depositor. That relationship is grounded in contract and is a debtor-creditor relationship, usually with the bank as the debtor and the depositor as the creditor. *Petersen v. Carstensen*, 249 N.W.2d 622 (Iowa 1977); *Schaller v. Marine Nat'l Bank of Neenah*, 131 Wis.2d 389, 388 N.W.2d 645 (1986); *State ex rel. Meyer v. American Community Stores Corp.*, 193 Neb. 634, 228 N.W.2d 299 (1975). *See also*, White & Summers, Uniform Commercial Code § 17-1 (2d Ed.1980); 5A Michie on Banks & Banking, Ch. 9, § 1 (1983). The laws of a state at the time of the formation of the contract become part of that contract. *Hall GMC, Inc. v. Crane Carrier Co.*, 332 N.W.2d 54 (N.D.1983). Absent a contrary agreement between the parties, the Uniform Commercial Code [2] provisions governing bank deposits and collections govern the depositor's contract with a bank. Section 41-04-03(1), N.D.C.C. [U.C.C. § 4-103(1)]. Pursuant to Section 41-04-28, N.D.C.C. [U.C.C. § 4-401], a bank may charge an otherwise properly payable item [3] against a customer's account even though that charge creates an overdraft.

---

**2.** North Dakota enacted the Uniform Commercial Code in 1965. 1965 N.D.Sess.Laws, ch. 296.

**3.** Properly payable includes the availability of funds for payment at the time of decision to pay or dishonor. Section 41-04-04(1)(i), N.D.C.C. [U.C.C. § 4-104(1)(i)].

When a bank honors a customer's overdraft, it makes an unsecured loan to that customer, and thus, absent an agreement to the contrary, a bank need not honor a customer's overdrafts even if it has previously done so. *Modoc Meat & Cattle Co. v. First State Bank of Oregon*, 271 Or. 276, 532 P.2d 21 (1975); *Schaller v. Marine Nat'l Bank of Neenah, supra;* 5B Michie on Banks & Banking, Ch. 9, §§ 301, 303 (1983). A bank's internal policy in responding to an overdraft situation does not create an obligation to follow that policy absent a contract or estoppel. *Schaller v. Marine Nat'l Bank of Neenah, supra.* Absent a contrary agreement, a customer may not require a bank to pay an overdraft if the bank deems it improper to do so, and a bank is not obligated to give its customer notice of a potential overdraft and to subsequently honor that overdraft upon assurances of a forthcoming deposit. *Schaller v. Marine Nat'l Bank of Neenah, supra;* 5B Michie on Banks and Banking, Ch. 9, § 303 (1983). A bank's decision to honor or dishonor a check creating an overdraft but otherwise properly payable is a business decision turning on factors such as the size of the overdraft and the bank's view of its customer. *Schaller v. Marine Nat'l Bank of Neenah, supra;* White & Summers, Uniform Commercial Code § 17–3 (2d Ed.1980).

With these principles of banking law in mind, we will turn to the bank-depositor relationship in the instant case. Thiele signed an account agreement with the Bank, dated November 30, 1983, which provided:

"AGREEMENT—The following printed terms will govern the operation of this account, unless clearly varied in writing or typing on this form or in a separate written agreement (reference to which should, but may not, appear on this form).

\*　　\*　　\*　　\*　　\*　　\*

"INSUFFICIENT FUNDS AND OVER-DRAFTS— ... We do not in any way oblige ourselves to pay any item which would overdraw this account regardless of the frequency with which we may do so hereafter as a matter of practice."

That express agreement restates the Bank's rights and obligations with respect to Thiele's account and essentially tracks the Bank's rights under North Dakota's enactment of the U.C.C. Pursuant to Section 9–06–07, N.D.C.C., the written agreement supersedes any prior oral agreements or negotiations between the parties concerning overdrafts, and parol evidence is inadmissible to vary or contradict the terms of that agreement. *Bye v. Elvick*, 336 N.W.2d 106 (N.D.1983). Because of the explicit language of that written agreement, we do not believe that any course of conduct before that agreement could modify or explain that agreement. *See Schaller v. Marine Nat'l Bank of Neenah, supra.* However, we must also consider whether or not the parties entered into a subsequent agreement modifying or replacing the November 30, 1983, written account agreement.

Section 9–06–01, N.D.C.C., provides:

"A contract is either express or implied. An express contract is one the terms of which are stated in words. An implied contract is one the existence and terms of which are manifested by conduct."

In *Bismarck Hospital Ass'n v. Burleigh County*, 146 N.W.2d 887, 892–93 (N.D. 1966), we said:

"The main difference between an express contract and an implied contract in fact is that in the former the parties arrive at their agreement by words, either oral or written, while in the latter their agreement is arrived at by a consideration of their acts and conduct. In both of these instances there is, in fact, a contract existing between the parties, the only difference being in the character of the evidence necessary to establish it. To constitute either the one or the other, the parties must occupy toward each other a contract status, and there must be that connection, mutuality of will, and interaction of parties.

\*　　\*　　\*　　\*　　\*　　\*

"Thus, express contracts and implied contracts are essentially based on the mutual intentions of the parties, with the former based on the express oral or written assent of the parties and the latter based on the surrounding facts and circumstances as to whether the parties actually intended to enter into a contract but failed to articulate their promises. Under contracts implied in fact, the court merely attempts to determine from the surrounding circumstances what the parties actually intended."

In the instant case the evidence presented to the district court on the motion for summary judgment, viewed in the light most favorable to Thiele [*e.g., Lohse v. Atlantic Richfield Co.*, 389 N.W.2d 352 (N.D.1986)], indicates that Thiele often purchased livestock by check without sufficient funds in his business checking account and subsequently covered those checks with the proceeds from livestock sales. Thiele's bank statements establish that his account had large daily overdrafts from 1979 until July 1984. The Bank paid Thiele's overdrafts up to $50,000 without receiving assurances from Thiele that deposits were forthcoming; however, on overdrafts of more than $50,000, the Bank received assurances from Thiele that deposits were forthcoming. Thiele described the Bank's practice in his deposition:

"Q. And you've never had any agreement of any kind with the Security State Bank of New Salem relative to the payment of overdrafts, have you?

"A. Yes, I have.

"Q. Oh, you have.

"A. Yes, I have.

"Q. Do you have any documents reflecting any such agreement?

"A. No.

"Q. So this agreement that you tell me you have, that would be something that's oral; is that right?

"A. Yes.

"Q. It is fair to say that that oral agreement that you had with respect to overdrafts was that if you had significant overdrafts, you would get a call from the Security State Bank of New Salem, and they would tell you that unless deposits were promptly made to cover the overdrafts, the bank would be returning the checks?

*    *    *    *    *    *

"A. Not—you're not putting it in the right form. They would call me and ask me what deposits I had coming in and when. Allyn would call me, but not telling me that I had to have so much there at a certain time.

"Q. Well, you understood the reason that Allyn was calling you was to make sure that you had deposits coming in that were sufficient to cover the overdrafts; correct?

"A. He would ask me what deposits I had coming in, yes.

"Q. And the reason for his call, obviously, was to make sure that you had deposits coming in and that you weren't just taking off for Tahiti, or something like that, leaving the bank sitting there with a couple hundred thousand dollars of uncovered checks; correct?

*    *    *    *    *    *

"A. Yes.

"Q. Of course, when he called and asked you if there were deposits coming in—when he called you and asked you if there were deposits coming in to cover the overdrafts, you always tried to make sure you had enough money coming in so they would be covered and you could stay in business; correct?

"A. I would try to, yes. Sometimes I couldn't make it, and sometimes they would pay the overdrafts, anyway.

"Q. But if the overdrafts were substantial and you didn't have significant deposits coming in, then what would happen is, customarily, the bank would return the checks, wouldn't they?

"A. Yes.

"Q. And they had done that on dozens of occasions prior to July of 1984, hadn't they—returned your checks NSF; correct?

"A. Not that many, sir.

\* \* \* \* \* \*

"Q. (MR. DADY CONTINUING) The question I'm putting to you, Mr. Thiele is this: Isn't it true that the bank didn't do anything that it shouldn't have; that is, you don't have any complaints about the way you were treated?

"A. I don't know anything about the banking laws, but they did pay overdrafts, and then they, all of a sudden, quit paying them.

"Q. You don't have any—you're not contending, are you, that they had any obligations to pay overdrafts if you didn't furnish to them the funds to cover those overdrafts; correct?

"A. Well, they always paid the overdrafts.

"Q. They paid the overdrafts when you gave them assurances that you would bring the money in to cover the overdrafts; correct?

"A. Yes.

"Q. Okay. And if you didn't give them assurances that you were going to cover the overdrafts, you're not contending that the bank would have to go on and pay these checks, even though you weren't bringing any money in, are you?

"A. They did.

"Q. That's because you brought money in, didn't you? When they paid the overdrafts, you brought deposits in to cover them?

"A. There were times they paid them without the deposits being in there.

"Q. And that was when you gave them assurances that additional amounts would be coming in; correct?

"A. Not all the time, no.

\* \* \* \* \* \*

"Q. Okay. Thank you. And you're not contending that the bank engaged in any type of—or Mr. Goetz engaged in any type of misrepresentation that caused you damage, are you?

"A. The only thing, I was under the impression that they were going to pay some of these overdrafts, and they—all of a sudden they quit.

"Q. That's it?

"A. Yes."

We have examined this evidence and the other evidence presented to the district court within the parameters of Rule 56(e), N.D.R.Civ.P., and *First National Bank of Hettinger v. Clark,* 332 N.W.2d 264, 267 (N.D.1983),[4] and we conclude that Thiele did not present evidence to the district court of an express oral or written agreement subsequent to the November 30, 1983, account agreement. However, Thiele contends that the Bank's conduct in paying overdrafts created an implied in fact contract.

A similar argument was made in *Schaller v. Marine Nat'l Bank of Neenah, supra.* In that case, the depositor (SPA) contended that a prior course of dealing between the parties, in which the bank had always either honored SPA's overdrafts or called SPA before dishonoring checks to allow SPA the opportunity to cover the overdrafts, created a prospective obligation either to act similarly or to give SPA prior notice that it would no longer do so. SPA did not assert that an express oral or written agreement required the bank to honor SPA's overdrafts or to provide notice before dishonoring those overdrafts. Rather SPA claimed that the prior course of dealing created a legal obligation on the bank arising out of an implied contract, promis-

---

4. In *First National Bank of Hettinger v. Clark,* 332 N.W.2d 264, 267 (N.D.1983), we said:

"A party resisting a motion for summary judgment has the responsibility of presenting competent admissible evidence by affidavit or other comparable means, NDRCivP 56(e); *Spier v. Power Concrete, Inc.,* 304 N.W.2d 68 (N.D.1981); and, if appropriate, drawing the court's attention to evidence in the record by setting out the page and line in depositions or other comparable document containing testimony or evidence raising a material factual issue, or from which the court may draw an inference creating a material factual issue.

"In summary judgment proceedings the trial court has no legal obligation, judicial duty, or responsibility to search the record for evidence opposing the motion for summary judgment."

sory estoppel, or the duty of good faith, to honor the checks or to provide notice of the overdraft or of its intention to dishonor.

The lower court granted the bank's motion for summary judgment, ruling that the bank's past practice of giving notice to SPA was merely a bookkeeping courtesy and created no prospective obligation. The Wisconsin Court of Appeals affirmed and held, as a matter of law, that the bank's previous practice of honoring SPA's overdrafts or giving notice could not, alone, evidence an implied contract to do so at all times. The court of appeals, rejecting SPA's argument that a course of dealing could give rise to an agreement under the applicable U.C.C. provisions, held that U.C.C. § 1–205 [Section 41–01–15, N.D. C.C.] allows consideration of a course of dealing as a tool for interpreting a contract whose existence is acknowledged, but normally not as a basis for the formation of a contract. The court said:

"We cannot accept SPA's argument. As discussed above, the bank has a statutory right, deemed to be incorporated into the parties' express contract, to decide whether or not to honor checks creating an overdraft. No express agreement between the parties here altered that right. The bank exercised its discretion in SPA's favor on a number of occasions. To assert that the bank thereby bound itself to do so in the future regardless of circumstances, or to give notice that it would not, is unreasonable. There is absolutely no commonsense inference that the bank intended to so bind itself.

"The same rationale applies to the bank's practice of notifying SPA of overdrafts and honoring overdrafts on the assurance of a covering deposit. The bank had no statutory or common law obligation to so act, nor did an express agreement oblige it to do so. As a matter of law, we cannot construe the bank's previously offering such courtesies to SPA, without more, as evidence that it contracted to do so in future." *Schaller v. Marine Nat'l Bank of Neenah, supra,* 388 N.W.2d at 649–50.

◼ We agree with the rationale expressed by the Wisconsin Court of Appeals, and we believe that that rationale is even more persuasive in the instant case because the written account agreement between Thiele and the Bank unambiguously and explicitly provided that the Bank did not oblige itself to pay any item which would overdraw the account regardless of the frequency with which it may have done so as a matter of practice. The unambiguous language explains any course of dealing which may have occurred before the execution of the account agreement and negates any informal modification of express terms subsequent to the written agreement. *See Schaller v. Marine Nat'l Bank of Neenah, supra,* 388 N.W.2d at 650.

We therefore conclude that, in view of the explicit language of the account agreement reiterating the Bank's rights and obligations under North Dakota's enactment of the U.C.C., the Bank's practice of honoring Thiele's overdrafts did not evidence an implied contract to do so at all times or to extend Thiele an unlimited line of credit.

We also find persuasive the rationale of the Wisconsin Court of Appeals that the prior course of conduct between the Bank and Thiele did not constitute promissory estoppel because that conduct did not evidence a promise. In *Lohse v. Atlantic Richfield Co., supra,* 389 N.W.2d at 352, we said that, before the doctrine of promissory estoppel may be invoked, the promise or agreement must be clear, definite, and unambiguous as to its essential terms. That feature is lacking in the instant case. *See Schaller, supra.*

Implicit in our holding is that Thiele could place no justifiable reliance on the Bank's practice of paying Thiele's overdrafts because the Bank's previous conduct did not rise to the level of allowing Thiele to assume he could write checks without the need to monitor the status of his account. *See Schaller, supra.*

Because of our resolution of this issue and because Thiele's remaining issues hinge on the existence of a contract to

extend a line of credit, we conclude that Thiele's argument on those issues must fail.

The partial summary judgment is affirmed.

GIERKE, VANDE WALLE, MESCHKE and LEVINE, JJ., concur.