B.W.S. INVESTMENTS, a partnership, consisting of Pius Scherr, Robert Walth, James Swanberg, and Arlie Braumberger, Plaintiff and Appellee,

v.

MID–AM RESTAURANTS, INC., and Donald L. Russell, Defendants and Appellants.

Civ. No. 890277.

Supreme Court of North Dakota.

July 31, 1990.

Freed, Dynes, Reichert & Buresh, PC, Dickinson, for plaintiff and appellee, argued by Ronald A. Reichert.

Kelsch, Kelsch, Ruff & Austin, Mandan, for defendants and appellants, argued by William C. Kelsch.

GIERKE, Justice.

Appellants Mid–Am Restaurants, Inc., (Mid–Am) and Donald Russell appeal from a district court judgment which awarded B.W.S. Investments (B.W.S.) $81,538.72 for rental payment arrearages, $15,000 for loss of enjoyment of ownership and loss of potential market value of its property, together with interest at six percent until date of entry of judgment and thereafter twelve percent until full payment is received by B.W.S. We affirm.

Mid–Am, a corporation engaged in the operation of family style restaurants in North Dakota, entered into a lease with K & S Investments on May 18, 1983. The lease was subsequently assigned to B.W.S., a partnership in which Pius Scherr, President of Scherr Construction Company in Valley City, North Dakota, was the managing partner and the only partner involved in this lawsuit.

The real estate lease and issue in this case arose out of discussions between Daniel Schmaltz, then President of Mid–Am, and Duane Peterson, a promoter and developer of real estate projects. Peterson's practice consisted of bringing together a potential builder/investor and a prospective tenant in return for a commission. Previously, Peterson had worked with Scherr as the builder/investor on several projects and in fact had brought Peterson and Schmaltz together on a project where Scherr had built a restaurant in Williston that was to be rented by Schmaltz.

While the Williston project was ongoing, Peterson and Schmaltz discussed the possibilities of Mid–Am leasing the former Mr. Steak restaurant building in Dickinson from Scherr and his B.W.S. partners if B.W.S. would be willing to invest in the building. After an inspection of the building, Mid–Am paid the earnest money to purchase the Mr. Steak building, extended the purchase agreement and secured the appraisal on the building. Eventually, B.W.S. purchased the former Mr. Steak building for $230,000.00, with Scherr contributing $100,000.00 in cash and borrowing the balance from a Dickinson bank.

Prior to the execution of the long-term lease between Mid–Am and B.W.S., Scherr was concerned that he would not be responsible for the superstructure and for any hidden system defects in the building due to the fact that since he had not built the building, he could not verify the systems of the building, the foundation system, or the superstructure of the building. To reflect this concern, Scherr modified the lease form used by him and Schmaltz for the Scherr constructed restaurant in Williston so as to include the following language:

"REPAIRS AND MAINTENANCE OF THE DEMISED PREMISES Lessee shall pay the cost of all repairs to and maintenance of the Demised Premises; including but not limited to all structural repairs, and shall at its expense maintain the foundation, underground or otherwise concealed plumbing and electrical and roof. Lessee shall give immediate written notice to Lessor of the need for any such repairs or corrections."

The lease, personally guaranteed by Schmaltz and Russell, was executed on May 9, 1983, and provided for a fifteen year term with rental payments of $12.50 per month per thousand of B.W.S.'s total investment in the original building and land together with the cost of leasehold improvements. After execution of the lease, Scherr Construction, under Schmaltz's exclusive direction, remodeled and redecorated the building to suit Mid–Am's requirements. Schmaltz had complete control of all renovations and repairs that were to be done to the building prior to Mid–Am's occupancy. On July 20, 1983, the Dakota Farm Restaurant opened for business.

Immediately after opening, Mid–Am experienced serious problems with the heating, ventilation, and air conditioning system (HVAC system). Mid–Am complained to Scherr as to the problems, but Scherr refused to do anything about it arguing that his only responsibility was to purchase the building, renovate the building according to Mid–Am's request, and to collect rent in the amount set out in the lease agreement. Thereafter, due to Scherr's continuous refusal to address Mid–Am's problems, Mid–Am, beginning in October of 1985, reduced its monthly rental payment to B.W.S. from $4,340.00 to $2,000.00. Mid–Am paid rent at this rate until April of 1988 at which time B.W.S. lost title to the premises as a result of a foreclosure action on the property. Subsequent to foreclosure, Mid–Am paid its rent to the foreclosing bank and eventually, Russell and Ken Lamont, an employee of Mid–Am, purchased the building from the bank for $150,000.

On April 13, 1987, B.W.S. commenced an action against Mid–Am, Donald Russell, and Schmaltz seeking the portion of its previous rent that Mid–Am had abated and for all future rental payments that would be due under the lease for the remaining lease term. Mid–Am defended its actions arguing that Scherr, through his alleged "agent" Peterson, warranted the property's fitness when he allegedly agreed verbally to provide Mid–Am with a suitable restaurant. Mid–Am argued that since Scherr breached his alleged promise to them, it had sufficient cause to abate a portion of its rent. Mid–Am counterclaimed with several causes of action against B.W.S. and Scherr.

The trial court held that Mid–Am had an equal duty to inspect the premises and that by occupying and accepting the premises, it waived any warranty it might have obtained from B.W.S. Further, the trial court held that B.W.S. was entitled to rely on the negotiated lease terms and had no obligation beyond the actual work performed for the benefit of Mid–Am. The

trial court held that if there was an agreement it should have been included in the written lease agreement. The court stated that:

> "The provisions of the written lease ... indicate to me quite clearly by more than a preponderance of the evidence that K & S Investments [B.W.S.] ... was to have almost no responsibility for the building, itself; instead, simply to furnish the capital to provide the building. All of the costs of operation, maintenance, repair, and including replacement, were the obligation of the lessee [Mid–Am]."

The court awarded B.W.S. damages in the amount of $81,538.72 for Mid–Am's failure to pay the full amount of the past due rent. Additionally, the trial court awarded B.W.S. damages in the amount of $15,-000.00 for B.W.S.'s loss of enjoyment of ownership and loss of potential market value in the property. The trial court dismissed all of Mid–Am's counterclaims and concluded that Mid–Am waived any warranties applicable to the lease and that there was no warranty of fitness for a particular purpose that arose from the lease. This appeal followed.

On appeal, Mid–Am initially contends that the trial court erred in not recognizing the existence of a separate and enforceable oral agreement negotiated between Peterson and Schmaltz. Mid–Am argues that Peterson and Schmaltz orally agreed that what could not be seen or inspected in the building would be Mid–Am's responsibility but what could be seen or inspected would be Scherr's responsibility. Since the HVAC system could have been easily inspected and was not hidden, Mid–Am contends that Scherr should be held liable for

the faulty system and all attendant losses caused by the faulty system. We disagree.

■ It is an elementary principle of contract law that the execution of a written contract supersedes all prior oral negotiations concerning the contract's subject matter. Section 9–06–07, N.D.C.C.[1] Pursuant to Section 9–06–07, the written agreement supersedes any prior oral agreements or negotiations between the parties concerning the contract subject matter and parol evidence is inadmissible to vary or contradict the terms of that agreement. *Thiele v. Security State Bank of New Salem*, 396 N.W.2d 295, 298 (N.D.1986).

■ The repair and maintenance lease provision specified that the "Lessee shall pay the cost of all repairs to and maintenance of the Demised Premises; including but not limited to all structural repairs, and shall at its expense maintain the foundation, underground or otherwise concealed plumbing and electrical and roof." The alleged previous oral agreement in which Mid–Am claims that Scherr, via his alleged agent Peterson, agreed to be responsible for items that could be seen or inspected, clearly contradicts the lease provision that provides that the "lessee shall pay the cost of all repairs to and maintenance of the Demised Premises...."

Because of the explicit and clear language of the written lease agreement, we do not believe that any course of conduct before that agreement should modify or be used to explain the unambiguous[2] repair and maintenance lease provision. *See* Section 9–07–04, N.D.C.C. (when a contract is reduced to writing, the intention of the parties is to be ascertained from the writing alone if possible); 3A *Thompson on Real Property* § 1230 (1981) (it is well set-

---

1. Section 9–06–07, N.D.C.C., provides that "The execution of a contract in writing, whether the law requires it to be written or not, supersedes all the oral negotiations or stipulations concerning its matter which preceded or accompanied the execution of the instrument."

2. Our conclusion that the lease terms were unambiguous differs from the trial court's finding that several of the lease provisions were ambiguous. However, the determination of whether or not a contract is ambiguous is a question of

law. *F–M Asphalt v. N.D. State Highway Dept.*, 430 N.W.2d 344, 345 (N.D.1988). As we stated in *F–M Asphalt*, "If the parties' intention can be ascertained from the writing alone, ..., then the interpretation of the contract is entirely a question of law, and this court will independently examine and construe the contract to determine whether or not the district court erred in its interpretation of it." *Id.* at 345 (quoting *Sorlie v. Ness*, 323 N.W.2d 841, 844 (N.D.1982)).

tled that, in the absence of fraud, mistake or accident, oral evidence of a warranty for fitness will not be admitted into evidence).

■ Therefore, we conclude that the trial court properly held that B.W.S. and Scherr were not liable for the faulty HVAC system. We agree with the trial court's reasoning that if there was a previous oral agreement specifically regarding the HVAC system, that agreement should have been spelled out in the negotiated written lease agreement. Because we conclude that the HVAC system was Mid–Am's responsibility, we find that Mid–Am had no justification for abating its rental payments. Thus, we affirm the trial court's award to B.W.S. of $81,538.72 for rental payment arrearages.

Secondly, Mid–Am contends that the trial court erred in not recognizing an implied warranty of habitability or fitness in the absence of an "as is" lease agreement. Mid–Am argues that Scherr and B.W.S. were aware of its intentions to use the premises as a family-style restaurant. In light of this knowledge, Mid–Am argues that Scherr and B.W.S. impliedly warranted the building's fitness for Mid–Am's particular purpose. Because neither Schmaltz nor Scherr inspected the HVAC system, Mid–Am argues that the trial court erred in concluding that it waived any warranty it might have obtained by not conducting a reasonable inspection of the premises.

■ On the other hand, B.W.S. contends that the implied warranty of habitability or fitness is not recognized in North Dakota for commercial property. Further, B.W.S. argues that Mid–Am was in full control of all the renovations of the building prior to its occupancy while B.W.S. merely acted as financiers of the project. If Mid–Am had inspected the HVAC system and had wanted the system replaced, B.W.S. would have either provided a new HVAC system or replaced any defects in the existing HVAC system and consequently recouped its additional investment through increased rental payments. B.W.S. maintains that by not requesting that the HVAC system be replaced or fixed prior to its occupancy, Mid–Am is precluded from arguing that B.W.S. is liable because once B.W.S. completed Mid–Am's requested renovations, the provisions of the lease controlled all subsequent repairs. We agree with both of B.W.S.' arguments.

While North Dakota statutory law requires a landlord of a *residential* dwelling unit to "make all repairs and do whatever is necessary to put and keep the premises in a fit and habitable condition" [Section 47–16–13.1(1)(b), N.D.C.C.], there is no statutory authority or case law authority in North Dakota that supports Mid–Am's argument for an implied warranty of habitability or fitness for a lease on commercial property.

Our review of the authorities reveals that the majority view, which we adopt, does not extend an implied warranty of habitability or fitness to commercial leases. *See* 3A *Thompson on Real Property*, § 1230 (1981) (the doctrine of warranty of fitness which is part of the law of sales does not generally extend to the landlord-tenant relationship in commercial leases; the implied warranty of habitability does not apply to commercial structures); 2 *Powell on Real Property*, § 233(2)(b) (1990) (implied warranty of habitability applies in almost all jurisdictions only to residential tenancies; commercial leases are excluded primarily on the rationale that the feature of unequal bargaining power justifying the imposition of the warranty in residential leases is not present in commercial transactions); 49 Am.Jur.2d *Landlord and Tenant* § 768 (1970), (the general rule that there is no implied warranty of fitness or as to the conditions of the premises applies to premises leased for business purposes); Annotation, *Modern Status of Rules as to Existence to Implied Warranty of Habitability or Fitness for use of Leased Premises*, 40 A.L.R. 3d 646, 650 (1971) (it has been stated that the implied warranty of habitability is not a warranty against all inconvenience or discomfort). *See generally*, Restatement (Second) of Property, Landlord and Tenant, § 5.1 Caveat and Comment (1977) (implied warranty of habitability not extended to commercial leases). *See also, Kootman v. Kaye*, 744

S.W.2d 898 (Mo.App.1988) (Missouri Court of Appeals rejected an implied warranty of habitability argument, premised on a faulty commercial air-conditioning system, because the warranty did not extend to commercial leases; the court held that by not extending the implied warranty to commercial leases, it would be following the majority of states).

As its last argument, Mid–Am argues that the trial court erred in awarding B.W.S. $15,000.00 for loss of enjoyment of ownership of the property. Mid–Am argues that this court should not affirm the $15,000.00 award because the award is not ascertainable by any generally recognized method of calculating damages. Furthermore, Mid–Am argues that the award of $15,000.00 was erroneous because damage for breach of contract cannot be awarded unless the damages are foreseeable. Arguing that it was not foreseeable that Scherr would lose the property by reason of a mortgage foreclosure, Mid–Am contends that no award should have been granted. We disagree.

■ The issue of the amount of damages is a question of fact and therefore, will not be set aside on appeal unless it is clearly erroneous pursuant by Rule 52(a), N.D.R.Civ.P. *Hopkins v. McBane*, 427 N.W.2d 85, 94 (N.D.1988). A finding of fact is clearly erroneous if this court is left with a definite and firm conviction that a mistake has been made. *Knudtson v. McLees*, 443 N.W.2d 903, 904 (N.D.1989). This court stated in *Bergquist–Walker Real Estate v. William Clairmont:*

> "Thus the uncertainty which prevents recovery of damages is the uncertainty as to the fact of damages, not the uncertainty as the the amount thereof. Where it is reasonably certain that damages have resulted, mere uncertainty as to the amount will not preclude recovery or prevent the jury from awarding damages. The proof must show with reasonable certainty that the plaintiff suffered damages and that such damages resulted from defendant's wrongful breach. Where the cause of and existence of damages have been established with sufficient certainty, recovery is not going to be denied because the exact amount of damages is difficult to ascertain...."

*Bergquist–Walker Real Estate v. William Clairmont*, 333 N.W.2d 414, 419 (N.D. 1983) (citing *North American Pump Corp. v. Clay Equipment Corp.*, 199 N.W.2d 888, 896 (N.D.1972)). In a case where the amount of damages may be hard to prove, the amount of damages is to be left to the sound discretion of the finder of facts. *Meyer v. Hansen*, 373 N.W.2d 392, 398 (N.D.1985).

■ The trial court held that B.W.S. was entitled to continue to own the building in light of the fifteen year lease agreement which it had entered into with Mid–Am and that "the failure by Mid–Am to pay the rentals when due was a primary contributing and proximate cause of the damages to B.W.S. Investments." The court held that loss of enjoyment of ownership of the building and the loss of its potential market value is a measurable item of damage. We agree. If Mid–Am would have continued to pay the negotiated lease payment of $4,340.00 per month rather than the abated amount of $2,000.00 per month, it is quite probable that to this day B.W.S. would own the restaurant building in Dickinson. Instead, B.W.S. had the building foreclosed upon and does not enjoy the ownership of that building. It seems clear to us that the trial court acted well within its discretion when it determined that B.W.S. has suffered damages as a result of Mid–Am's wrongful breach. While the $15,000.00 damages amount may appear to be difficult to ascertain, we are not left with a definite and firm conviction that a mistake has been made and, accordingly, we affirm the trial court's $15,000.00 award.

We decline to address Mid–Am's fourth issue involving the alleged error of the trial court in denying its counterclaims for the replacement cost of the defects in the lease premises because of our previous finding that B.W.S. was not responsible for the HVAC system under the provisions of the written lease.

Therefore, for the foregoing reasons, we affirm the district court's judgment in all respects.

ERICKSTAD, C.J., and MESCHKE, J., concur.

LEVINE, J., concurs in the result.

VANDE WALLE, Justice, concurring specially.

I concur in the result reached by the majority opinion. But, under the facts of this case, wherein the contract between the parties in effect specified that Mid–Am was to be responsible for the HVAC system, it is not necessary to determine whether or not we should extend the implied warranty of habitability or fitness to commercial property. I would leave that issue for another day and another set of facts wherein the responsibility of the lessee is not delineated by special provision in the contract such as it is here.

Additionally, my concurrence in the affirmance of the award of $15,000 "for loss of enjoyment of ownership and loss of potential market value of its property" is a reluctant one. I agree with the majority that the difficulty in proving the amount of damages should not prevent an award of damages. My concern is with the issue of causation. Mid–Am continued to make a portion of the payment and it appears to me that the determination by B.W.S. to forego making the mortgage payments and thus to open the door for foreclosure, resulting in its loss of the property, may have been one of choice rather than necessity. Despite my misgivings, I defer to the trial court's findings and conclusions because I am not convinced that a mistake has been made.