**CHRYSLER CREDIT CORPORATION**

v.

**WHITNEY NATIONAL BANK, et al.**

**Civ. A. Nos. 91–1727, 92–3696 and 92–3697.**

United States District Court,
E.D. Louisiana.

April 22, 1993.

Rudy J. Cerone, Charles R. Penot, Jr., Anthony J. Rollo, Jr., McGlinchey, Stafford & Lang, New Orleans, LA, Michael H. Rubin, McGlinchey, Stafford & Lang, Baton Rouge, LA, for plaintiff.

David McLean Culpepper, Talmage M. Watts, Milling, Benson, Woodward, Hillyer, Pierson & Miller, John S. Tsai, McDermott Inc., New Orleans, LA, for defendants.

## ORDER AND REASONS FOR RULING

CLEMENT, District Judge.

The following motions were decided this date on memoranda:

(1) Whitney's Motion for Reconsideration: DENIED.

(2) Whitney's Motion *in limine* to Withdraw Responses to Plaintiff's Requests for Admission Nos. 16 and 18: GRANTED.

(3) Chrysler's Motion *in limine* Requesting that Certain Matters Be Deemed Established for Trial Pursuant to Rule 56(d): DENIED.

(4) Whitney's Motion *in limine* to Strike Certain Portions of the Pre–Trial Order and to Prohibit the Plaintiff from Introducing Evidence of Aiding and Abetting

or "Conspiracy" to Defraud: GRANTED in part and DENIED in part.

(5) Chrysler's Motion *in limine* to exclude any evidence of· alleged comparative fault: GRANTED in part and DENIED in part.

(6) Whitney's Motion *in limine* to Exclude the Introduction of Evidence at Trial with Respect to Allegations that Whitney Allegedly Violated Bank Practices and/or Federal Banking Regulations and Statutes: GRANTED in part and DENIED in part.

(7) Whitney's Motion *in limine* to Exclude the Expert Report and Testimony of Alford C. Sinclair: DENIED.

(8) Whitney's Motion *in limine* to Exclude the Expert Report and Testimony of Daniel V. Dooley: GRANTED in PART and DENIED in PART.

## I. MOTION FOR RECONSIDERATION

### A. *Background*

On March 4, 1993, the Court ordered the parties to submit supplemental memoranda on Whitney's Motion for Reconsideration. Specifically, the Court asked the parties to address (1) when did Whitney's statutory security interest in the TOJ account arise?, and (2) if Whitney's statutory security interest in the account arose prior to Chrysler's security interest in the proceeds, does it affect the Court's priority analysis?

### B. *Chronological Priority of Security Interests*

La.R.S. 6:316(A) provides that a depository bank has a statutory lien on accounts of its depositor whenever "any loan, extension of credit, or other obligation [is] incurred by the depositor in favor of the bank." Section (B) of the statute provides that this lien operates as a statutory security interest. Section (C) of the statute provides the Bank with a statutory right to exercise setoff of deposit funds against indebtedness upon which the depositor has defaulted. *See In re Madcat Two, Inc.,* 127 B.R. 206, 210 (Bankr.E.D.Ark.1991).

Whitney had a statutory security interest in the TOJ account by virtue of its overdraft and other loans to TOJ. The issue here is whether Whitney's statutory security interest had priority, under pre-Article 9 [1] Louisiana law, over the security interest in proceeds created by Chrysler's collateral chattel mortgage.

La.R.S. 9:5354(A) provides that chattel mortgages are "effective against third persons from the time of filing of the mortgage or notice of security interest in the proper offices." Under section 5354(A), any priority dispute involving a chattel mortgage is resolved by chronological priority. *Junior Money Bags, Ltd. v. Segal,* 970 F.2d 1 (5th Cir.1992); *Youree v. Limerick,* 157 La. 39, 101 So. 864 (1924); *Arenson Intern., Inc. v. Shelving Systems Corp.,* 369 So.2d 1212 (La. App.2d Cir.1979). *See also* Dainow, "Ranking Problems of Chattel Mortgages and Civil Code Privileges in Louisiana Law," 13 La. L.Rev. 537 (1953).

La.R.S. 9:5353(E) provides, in pertinent part:

The mortgage or notice of security interest shall be filed as follows:

(1) If the mortgagor is a Louisiana corporation or a foreign corporation that has qualified to do business in Louisiana, in the chattel mortgage records of the parish in which the mortgagor maintains its registered office as shown in the records of the Louisiana secretary of state at the time the mortgage or notice of security interest is filed.

TOJ's registered office is in Jefferson Parish, Louisiana. Chrysler's Collateral Chattel Mortgage was recorded in the chattel mortgage records of Jefferson Parish on March 16, 1989. Thus, Chrysler's security interest in proceeds ranks from March 16, 1989.

Whitney contends that its numerous overdraft loans to TOJ constituted an "extension of credit." Chrysler does not dispute this proposition:

---

1. Chrysler would prevail under Louisiana's version of Article 9 of the UCC, as a "lien or privilege created by ... the Louisiana Revised

Statutes ... is not a security interest" for purposes of the UCC. La.R.S. 10:1–201(37).

Whitney's extraordinary actions of approving and paying tens of hundreds of "non-sufficient funds" checks drawn on the TOJ checking account, totalling in the tens of millions of dollars, amounted to the granting of an informal overdraft line of credit in favor of TOJ, which for both legal and accounting purposes should have been considered by Whitney as a "loan" rather than an ordinary negative balance overdraft in the TOJ checking account.

Chrysler's Memorandum in Opposition to Whitney's Motion for Reconsideration, filed July 9, 1992.

It is not disputed that the TOJ account was overdrawn from March 1 through March 17, 1989, and that it had been overdrawn on several earlier occasions. Consequently, Whitney had extended credit to TOJ at the time of, and prior to, the effective date of Chrysler's Collateral Chattel Mortgage against third parties.

It does not necessarily follow that later overdraft loans and other loans made by Whitney to TOJ relate back to March 1989 or earlier for ranking purposes. The earlier overdraft loans had been paid off by TOJ long before the set-offs giving rise to this litigation occurred. When Whitney set off the TOJ account in late 1990, it did so to recoup the debt represented by later overdraft loans and the more formal loan of December 28, 1989.

Under La.R.S. 6:316(A), the depositor is deemed to have pledged its account when the bank extends credit to it. The issue here is whether

(1) the initial pledge made by the depositor when the bank first extends credit remains in effect throughout the duration of the account and all later obligations are secured by, and rank from the date of, the initial pledge of the account, or

(2) the initial pledge is extinguished once the debt is repaid, and the depositor makes a new pledge for each additional obligation it incurs in favor of the bank which ranks from the date the new pledge is made.

Under outcome # 1, Whitney's statutory security interest is first-in-time. Under outcome # 2, Chrysler's contractual security interest is first-in-time.

Whitney cites La.Civ.Code art. 3158(D)(1) for the proposition that the subsequent payment of a loan does not extinguish the underlying pledge. The statute provides:

The assignment or transfer of the principal obligation does not: extinguish the pledge; constitute a new pledge or issuance; or affect the retroactive effect given by this Article for obligations to the original pledgee or its successor. In all cases, if the pledge at the time of its delivery, issuance or reissuance was intended to secure obligations that may arise in the future, the pledge relates back to the time of delivery, issuance, or reissuance if and when such future obligations are incurred, as long as the pledgee, the pledgee's agents, or the pledgee's successors have maintained possession of the pledged item.

Article 3158(D)(1) applies in circumstances where the pledged collateral is transferred or assigned to a third party, and does not apply to this case. Whitney should have cited article 3158(C)(1), which operates similarly to article 3158(D)(1), and concerns the retroactive ranking of a second pledge of the original collateral:

Whenever a pledge of any instrument or item of the kind listed in this Article is made or has been made to secure a particular loan or debt, or to secure advances to be made up to a certain amount, and, *if so desired or provided,* to secure any other obligations or liabilities of the pledgor or any other person, to the pledgee ... then existing *or thereafter arising* ... and the pledged instrument or item remains in the hands of the successor, then existing or thereafter arising, the instrument or item may

remain in pledge to the pledgee ..., or without withdrawal from the hands of the pledgee ..., be *repledged to the pledgee ... to secure at any time any renewal or renewals of the original loan or any part thereof or any new or additional loans, even though the original loan has been reduced or paid,*

up to the total limit which it was agreed should be secured by the pledge, and, if so

desired or provided, to secure any other obligations or liabilities of the pledgor or any other person to the pledgee or its successor, then existing or thereafter arising, up to the limit of the pledge, without any added notification or formality, and the pledge shall be valid as well against third persons as against the pledger thereof, if made in good faith; and *such ... additional loans and advances or other obligations or liabilities shall be secured by the collateral to the same extent as if they came into existence when the instrument or item was originally pledged and the pledge was made to secure them.* (Emphasis, structure added)

The Louisiana Supreme Court has noted that the retroactive ranking provided by article 3158 is

> an exception to the general rule that the privilege only ranks from the time the principal obligation arises, the exception being when the pledgor and pledgee agree at the time of the initial pledge that the pledge will also secure obligations of the pledgor to the pledgee thereafter arising.

*Texas Bank of Beaumont v. Bozorg,* 457 So.2d 667, 674 (La.1984). Thus, retroactive ranking is not automatic, as it must be provided for by contract.

■ The central inquiry in determining whether a pledge relates back to the date of an earlier pledge, for ranking purposes, is whether the pledgor and pledgee agreed that the earlier pledge would secure future obligations. In the case of conventional pledges, which are created by contract, the court must look to see whether the parties have inserted language evidencing an intent to have the collateral for the original loan secure future obligations. One Louisiana court has labeled this type of contract provision as a "gorilla clause." *Citizens Nat. Bank v. Coates,* 563 So.2d 1265 (La.App. 1st Cir.1990). For a good example of a "gorilla clause," *See* TOJ's Act of Pledge to Whitney of December 28, 1989.

In the case of Whitney's statutory pledge, there is no contract to interpret. The pledge mechanism of La.R.S. 6:316(A–B) was created by the Louisiana legislature, not by TOJ and Whitney. The statute does not contain any language suggesting that a statutory pledge of the funds to which the compensation of La.R.S. 6:316(A) applies secures any future obligations incurred by the depositor in favor of the bank.

■ The remaining question is whether the Court should read into La.R.S. 6:316(A–B) an implied "gorilla clause," providing that, once an account is deemed pledged, it remains pledged. The Court declines. In light of the presumption against retroactive ranking under Louisiana law, the Court holds that statutory pledges made in connection with later loans do not relate back, for ranking purposes, to the date of earlier statutory pledges of the same bank account.

The earliest pledge that can be deemed to secure Whitney's later overdraft loans and other loans to TOJ is the Act of Pledge executed by TOJ on December 28, 1989. As noted above, that document contains language providing that it secures all future obligations incurred by TOJ in favor of Whitney. Because Whitney's security interest ranks from December 28, 1989, at the earliest, Chrysler's security interest is senior under La.R.S. 9:5354(A), and has priority.

## C. *Procedural Requirements of La.R.S. 6:316(D)*

In addition, Whitney failed to comply with sections (C–D) of La.R.S. 6:316, which provide the mechanism to enforce the statutory security interest created by sections (A–B). The Court has previously held:

> In order to avail itself of the statutory setoff remedy provided in La.R.S. 6:316(C), the bank must comply with the notice requirement of La.R.S. 6:316(D):
>
>> The bank shall notify the depositor in writing within two business days following the exercise of the bank's remedies under Subsection C of this Section. Such notice shall be forwarded by registered or certified mail to the depositor's most current address reflected in the bank's records ...

Whitney has not provided the Court with any evidence that it provided TOJ with notice of setoff as required by La.R.S. 6:316(D). In addition, Whitney has not

594

established that TOJ was in "default" as required by La.R.S. 6:316(C). Accordingly, Whitney cannot avail itself of the statutory setoff remedy.

798 F.Supp. 1234, 1238 (1992).

Whitney contends that the provisions of La.R.S. 6:316(D) exist solely for the benefit of the depositors, and cannot be the basis of a third party's challenge to a setoff under La.R.S. 6:316(C). However, at least one court has held that a creditor of the depositor may challenge a setoff because of the bank's failure to comply with setoff procedures. *Michigan Carpenters' Council Pension Fund v. Smith & Andrews Constr. Co.*, 681 F.Supp. 1252, 1255 (E.D.Mich.1988). The parties have not provided, and the Court is not aware of, any contrary authority.

### D. Conclusion

Accordingly, the Court holds that Chrysler's security interest in proceeds outranks Whitney's security interest in the TOJ account. The Court does not reach the question of whether a bank with a (chronologically) senior security interest in the debtor's account has priority over a proceeds-secured creditor with a (chronologically) junior interest in proceeds deposited into the account.

## II. WHITNEY'S ADMISSIONS

### A. *Background*

Whitney has filed a motion *"in limine"* to Withdraw Responses to Chrysler's Requests for Admission Nos. 16[2] and 18[3].

Last year, Chrysler moved to strike portions of Whitney's memoranda filed in connection with the parties cross-motions for summary judgment on Chrysler's conversion claim. In denying that motion as moot, the Court noted:

The Court has held that statements in Requests for Admission Nos. 16 and 18 are

correct as a matter of law. However, the fact that Chrysler has a first priority security interest in the proceeds does not necessarily mean that Chrysler's interest in the proceeds has priority over Whitney's interest in the TOJ account or Whitney's right of setoff. While conceding the existence Chrysler's security interest, Whitney may contest its legal implications.

798 F.Supp. at 1244.

More recently, in its Motion for Reconsideration, Whitney has contested the validity of Chrysler's security interest in proceeds, not just its legal implications. Even so, Admissions #16 and #18 remain moot for purposes of these district court proceedings, as the Court has held that the recordation of Chrysler's Collateral Chattel Mortgage adequately informed the world of Chrysler's security interest in TOJ's proceeds.[4] *See* March 4, 1993 Order and Reasons. This issue has been litigated for the last time before this Court.

However, Whitney's admissions may become relevant on appeal or on remand. If Chrysler prevails on its conversion claim and Whitney appeals the Court's ruling that the Collateral Chattel Mortgage creates a security interest in proceeds, the degree to which Whitney's admissions are binding could affect Whitney's ability to raise that argument on appeal. Accordingly, the Court will address the merits of Whitney's Motion to Withdraw.

### B. *Standard for Withdrawal*

Fed.R.Civ.P. 36(b) provides, in pertinent part:

Any matter admitted under this rule is conclusively established unless the court on motion permits withdrawal or amendment of the admission. Subject to the provision of Rule 16 governing amendment

---

**2.** "Credit advances made by Chrysler Credit to TOJ to finance TOJ's wholesale inventory purchases of new Toyota automobiles were secured under the Collateral Chattel Mortgage by TOJ's new and used motor vehicle inventory and the proceeds derived from inventory sales."

**3.** "Under the Collateral Chattel Mortgage, Chrysler Credit had a first priority security interest in

TOJ's new and used motor vehicle inventory and in the proceeds derived from inventory sales."

**4.** In addressing this argument, the Court opted to rule on the merits of the parties' contentions, rendering the admission issue moot. The Court just as easily could have based its ruling on Whitney's admissions.

of the pre-trial order, the court may permit withdrawal or amendment when the presentation of the merits of the action will be subserved thereby and the party who obtained the admission fails to satisfy the court that withdrawal or amendment will prejudice that party in maintaining the action or defense on the merits.

Fed.R.Civ.P. 16(e), referred to in Rule 36(b), above, provides:

After any conference held pursuant to this rule, an order shall be entered reciting the action taken. This order shall control the subsequent course of the action unless modified by a subsequent order. The order following a final pretrial conference shall be modified only to prevent manifest injustice.

The threshold question is whether the Court should evaluate Whitney's motion to withdraw under the two part test of Rule 36(e) or the "manifest injustice" standard of Rule 16(e), which applies once "the order following a final pretrial conference" has been submitted.

Whitney's Motion to Withdraw was filed on July 13, 1992, after the parties confected the Pre–Trial Order in advance of a July 2, 1992 pre-trial conference and July 20, 1992 trial setting. If this matter had proceeded to trial as scheduled, the Court would have had to apply the "manifest injustice" standard to Whitney's motion. However, the trial, which had been scheduled for July 20, 1992, was continued until March 22, 1993, and has been continued again, until May 17, 1993. The final pre-trial conference will be held on April 28, 1993, and a new Pre–Trial Order will be submitted at that time. In light of the continuances, the more relaxed two-part test of Rule 36(b) controls.

## C. *Application of the Two–Part Test*
### 1. Presentation of the Merits Will Be Subserved

■ The admissions in question concern a mixed question of law and fact[5]—namely, whether Chrysler's Collateral Chattel Mortgage created a security interest in proceeds. Because there are no disputed facts concerning the contents of the mortgage or when it was filed, the effect of the admissions at this stage of the litigation is purely legal.

The Court finds that the presentation of the merits will be subserved by allowing Whitney to withdraw its admissions. Although the Court has held that the mortgage creates a security interest in proceeds, the Court recognizes that there are grounds for a difference of opinion on this issue. Allowing Whitney to present this argument on appeal will allow the parties to fully litigate this central issue on the merits.

### 2. No Prejudice to Chrysler

More importantly, Chrysler will not be prejudiced by allowing Whitney to withdraw its admissions. The Fifth Circuit has recognized that "the prejudice contemplated by Rule 36(b) relates to special difficulties a party may face caused by a sudden need to obtain evidence upon withdrawal or amendment of an admission." *American Auto. Ass'n v. AAA Legal Clinic,* 930 F.2d 1117, 1120 (5th Cir.1991). Allowing Whitney to withdraw Admissions Nos. 16 and 18 will not require Chrysler to obtain additional evidence or otherwise affect Chrysler's trial preparation, as the Court has affirmed the legal conclusions contained in those admissions.

The only effect of allowing the withdrawal will be that Chrysler may have to litigate the issue on appeal. This will not place any additional burden on Chrysler, as the parties have already litigated this issue at the district court level.[6]

Accordingly, Whitney's Motion to Withdraw will be granted.

## III. CHRYSLER'S MOTION TO DEEM CERTAIN MATTERS ESTABLISHED UNDER RULE 56(d)

■ Chrysler contends that certain factual matters should be deemed established for

---

**5.** The courts are divided as to whether a mixed question of law and fact can be the proper subject of a request for admission. *See* Fed.R.Civ.P. 36, Advisory Committee Note; 8 Wright and Miller, *Federal Practice and Procedure,* § 2255 (1970 and 1992 Supp.).

**6.** In responding to Whitney's Supplemental Memorandum in Support of Motion for Reconsideration, Chrysler addressed the merits of Whitney's contention that the Collateral Chattel Mortgage did not create a security interest in proceeds.

trial purposes pursuant to Fed.R.Civ.P. 56(d), because they were asserted in Chrysler's Statement of Material Facts as to Which There is No Genuine Issue to Be Tried, filed in connection with the parties' cross motions for summary judgment pursuant to Local Rule 2.09, and not contradicted by Whitney's Statement of Disputed Material Facts, filed pursuant to Local Rule 2.10. Specifically, Chrysler requests that the following be deemed established: (1) the amount of its damages, (2) the existence of a fiduciary relationship between TOJ and Chrysler, and (3) the fact that Whitney's practice of covering TOJ's overdrafts was not done in the ordinary course of business.

Fed.R.Civ.P. 56(d) provides:

If on motion under this rule judgment is not rendered upon the whole case or for all of the relief asked and a trial is necessary, the court at the hearing of the motion, by examining the pleadings and the evidence before it and by interrogating counsel, shall if practicable ascertain what material facts exist without substantial controversy and what material facts are actually in good faith controverted. It shall thereupon make an order specifying the facts that appear without substantial controversy, including the extent to which the amount of damages or other relief is not in controversy, and directing such further proceedings in the action as are just. Upon the trial of the action the facts so specified shall be deemed established, and the trial shall be conducted accordingly.

Chrysler contends that such an order is authorized by Rule 56(d), and would expedite the trial process by narrowing the issues for which the parties will present proof. Whitney contends that Chrysler's motion is a "wholly inappropriate" effort to have disputed matters deemed undisputed.

The Court declines to grant the requested relief for two reasons.

First, the matters that Chrysler seeks to have established are mixed questions of fact and law. Chrysler's damage estimate is primarily a factual issue, but it is dependent upon the resolution of various legal ques-

tions, including the appropriate tracing method to be used. *See* Gabriel, *Louisiana Security Rights in Personal Property*, pp. 104–05 (1991) ("The most common tracing device is the lowest intermediate balance rule"). The "fiduciary duty" issue is primarily a legal question. Although the Court addressed the issue in the LUFA context,[7] it has not been thoroughly briefed by the parties nor conclusively resolved by the Court. The "ordinary course" issue is a mixed question of fact and law that is particularly inappropriate for summary resolution, as (1) legal authorities on the issue had not been presented by the parties until they filed their memoranda in connection with the present motion, and (2) conflicting inferences could reasonably be drawn from the facts.

Second, the Court concurs with other courts that have declined to make findings as to which material facts were in dispute and which were not, where it would not enable the Court to dispose of any claims in the litigation. *See, e.g., Williams v. Sinclair,* 529 F.2d 1383 (9th Cir.1975), *cert. denied,* 426 U.S. 936, 96 S.Ct. 2651, 49 L.Ed.2d 388 (1976); *Meschino v. International Tel. & Tel. Corp.,* 563 F.Supp. 1066, 1073 (S.D.N.Y.1983). The objective of Chrysler's motion—the narrowing of issues prior to trial—is properly achieved by agreeing to stipulations in the pre-trial order. To the extent that the aforementioned matters are not disputed, Whitney is *obligated* to so stipulate in the Pre–Trial Order.

## IV. PLEADING FRAUD WITH PARTICULARITY

Whitney has filed a motion *in limine* to (1) strike from the Pre–Trial Order any reference to a claim by Chrysler that Whitney aided and abetted, or conspired with, Louis and Ethel Normand or TOJ to defraud Chrysler, and (2) prohibit Chrysler from introducing any evidence of such aiding and abetting or conspiracy at trial. The Court will address the substantive issues in this section of the order, and reserve evidentiary

---

**7.** In granting Whitney's Motion to Dismiss Chrysler's LUFA claim, the Court held that TOJ and Chrysler did not have the type of fiduciary relationship contemplated by the UFA.

issues for the next section ("Collateral Issues").

Chrysler contends that it has adequately asserted a fraud claim against the Normands and a claim of aiding and abetting fraud/conspiring to commit fraud against Whitney. Whitney contends that Chrysler has not stated its aiding and abetting/conspiracy claim with the specificity required by Fed.R.Civ.P. 9(b), which provides that "[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity."

Chrysler clearly did not intend to assert a fraud claim at the time it filed its original and Amended Complaints. Chrysler's Amended Complaint describes with precision six specific, enumerated causes of action: (1) conversion, (2) unjust enrichment, (3) interference with contractual relations, (4) aiding and abetting breach of fiduciary duty (Counts IV–V), (5) breach of Louisiana Uniform Fiduciaries Act (Count VI) and (6) aiding and abetting conversion (Count VII). The word "fraud" does not appear anywhere in the complaints, and the issue was not raised by Chrysler until after the Court held that Chrysler must establish fraud, collusion or otherwise unfair behavior to (1) overcome Whitney's defense based on La.R.S. 6:317, and (2) entitle itself to the equitable tracing remedy. 798 F.Supp. at 1241, 1247.

■ Chrysler points out that it is not necessary to include the word "fraud" in the pleadings or specifically designate a "fraud" claim. *Simcox v. San Juan Shipyard, Inc.,* 754 F.2d 430, 439 (1st Cir.1985); *Franz v. Iolab, Inc.,* 801 F.Supp. 1537, 1541–42 (E.D.La.1992). The plaintiff alleging fraud need only allege with particularity the defendant's acts which the plaintiff contends amount to fraud. *Franz,* 801 F.Supp. at 1541–42.

Fraud is defined as "a misrepresentation or suppression of the truth made with the intention to obtain an unjust advantage for one party or to cause a loss or inconvenience to the other." La.Civ.Code art. 1953. As to aiding and abetting or conspiracy, the Civil Code provides that "[h]e who *conspires* [8] with another person to commit an intentional or willful act is answerable, in solido, with that person, for the damage caused by such act" (emphasis added). La.Civ.Code art. 2324(A). Thus, Chrysler's complaint must state the circumstances in which Whitney conspired with TOJ to misrepresent or suppress the truth to obtain an unjust advantage at the expense of, or to cause a loss or inconvenience to, Chrysler.

Remarkably, Chrysler has not directed the Court's attention to a specific allegation in its Complaint that Whitney conspired with TOJ in misrepresenting or suppressing information from Chrysler. However, Chrysler's complaint does contain one allegation which could be construed as alleging fraud:

> Whitney's knowing and regular practice of granting Overdraft Loans to TOJ to cover overdrafts in connection with the monthly Chrysler Credit floor plan audit substantially aided, abetted and assisted TOJ in: ... concealing its out of trust position from Chrysler Credit ...

Amended Complaint, ¶ 34. Thus, Chrysler has alleged that TOJ has engaged in the act of "concealing its out of trust position from Chrysler Credit" and that Whitney has assisted, and (arguably) conspired with TOJ, by "granting Overdraft Loans to TOJ to cover overdrafts in connection with the monthly Chrysler Credit floor plan audit."

To plead the "circumstances" of fraud, the Fifth Circuit has held that,

> [a]t a minimum, Rule 9(b) requires allegations of the particulars of "time, place, and contents of the false representations, as well as the identity of the person making the misrepresentation and what he obtained thereby."

*Tel–Phonic Services, Inc. v. TBS International, Inc.,* 975 F.2d 1134, 1138 (5th Cir. 1992), *citing* 5 Wright and Miller, *supra,* § 1297, p. 590. *See also Franz,* 801 F.Supp. at 1541.

---

**8.** In 1987, the statute was amended to apply only to those who "conspire" with others to commit intentional or willful acts. The statute previously applied to those who "caused," "assisted" or "encouraged" other persons to commit unlawful acts.

598

■ Fraud by silence, as alleged in Paragraph 34 of Chrysler's complaint, "is, by its very nature, difficult to plead with particularity." *Daher v. G.D. Searle & Co.*, 695 F.Supp. 436, 440 (D.Minn.1988). Because it does not involve an affirmative misrepresentation, it often does not occur at a specific place or precise time, or involve specific persons. Nonetheless, a plaintiff alleging fraud by silence should be able to allege the following with reasonable particularity: (1) the information that was withheld, (2) the general time period during which the fraudulent conduct occurred, (3) the relationship giving rise to the duty to speak,[9] and (4) what the person or entity engaged in the fraudulent conduct gained by withholding the information. In addition, because Chrysler is alleging conspiracy to defraud, Chrysler must establish what the conspiring party did, and what it gained, in assisting the person with the duty to speak. *Andreo v. Friedlander, Gaines, Cohen, etc.*, 651 F.Supp. 877 (D.Conn.1986); *National Egg. Co. v. Bank Leumi Le–Israel B.M.*, 504 F.Supp. 305, 308 (N.D.Ga.1980).

■ Arguably, Chrysler's complaint has met this minimum threshold. Through a bit of detective work, one can find most of the necessary information scattered about in various portions of the Amended Complaint.[10] However, Chrysler's effort was hardly sufficient to put Whitney or the Normands on notice that Chrysler was alleging a conspiracy to defraud. *See* 5 Wright and Miller, *supra*, § 1298, p. 648 ("Perhaps the most basic consideration in making a judgment as to the sufficiency of a pleading is the determination of how much detail is necessary to give adequate notice to an adverse party and enable him to prepare a responsive pleading").

The Fifth Circuit has recently held that a fraud claim "sandwiched" between non-fraud allegations "would not suffice under Fed. R.Civ.P. 9(b)." *Stamps v. Collagen Corp.*, 984 F.2d 1416, 1422 (5th Cir.1993). Even if the information necessary to construct a fraud claim is present in Chrysler's Amended Complaint, that claim does not pass muster under Rule 9(b). Notice pleading is "to be distinguished from reading tea leaves." *Id.* The fact that Chrysler could not identify a specific misrepresentation or suppression of the truth in its own complaint indicates that Whitney could not have been adequately put on notice of such a claim. Accordingly, Chrysler does not have a claim of conspiracy to defraud.

## V. COLLATERAL ISSUES

The parties have filed motions to exclude evidence that is probative of irrelevant propositions. Whitney's Motion to Strike Certain Portions of the Pre–Trial Order, Etc., discussed above, seeks to exclude evidence probative of Chrysler's unpleaded conspiracy to defraud claim. Chrysler's Motion *in limine* to Exclude Evidence of Comparative Fault seeks to exclude evidence probative of comparative fault, a defense that is not available to Whitney. Finally, Whitney's "Motion *in limine* to Exclude the Introduction of Evidence at Trial with Respect to Allegations that Whitney Allegedly Violated Bank Practices and/or Federal Banking Regulations and Statutes" seeks to exclude evidence relevant to violations of banking laws or customs, as Chrysler does not have standing to assert a claim based on such violations.

■ Although the evidence sought to be excluded by each of these motions is probative of a collateral issue that is not pertinent to this litigation, the evidence may also be probative of relevant propositions. Indeed,

---

**9.** It is well-settled in Louisiana, as it is elsewhere, that there is no fraud by silence unless there is a duty to speak. *Greene v. Gulf Coast Bank*, 593 So.2d 630 (La.1992).

**10.** Chrysler's amended complaint describes the information withheld as TOJ's "out of trust" status. Chrysler's Amended Complaint, ¶ 34(b). The complaint also describes in detail the time frame in which Whitney made overdraft loans to TOJ. *Id.* at ¶¶ 25–31. The complaint also describes the relationship between TOJ and Chrysler, which, arguably, gave rise to TOJ's duty to speak, *id.* at ¶¶ 8–11, and Whitney's awareness of that relationship. *Id.* at ¶ 18(b). Finally, the complaint describes what Whitney did to assist TOJ's fraud—the overdraft loans, *Id.* at ¶ 34, and what Whitney gained from that fraud—the collection of the proceeds from the sale of Chrysler's collateral. *Id.* at ¶ 35.

"the concept of admissibility for limited purposes is fundamental in the Anglo–American law of Evidence." 1 Weinstein & Berger, *Weinstein's Evidence,* ¶ 105[01] (1992). The Fifth Circuit has noted:

> When evidence is challenged solely on the ground that it is irrelevant, it is inadmissible only if it fails to meet the definition of Rule 401—it must be without probative value as to *any* fact of consequence to the determination of the action. If it is relevant as to any issue, it is relevant to the action and is not inadmissible under Rule 402.

*Lubbock Feed Lots, Inc. v. Iowa Beef Processors,* 630 F.2d 250, 267 (5th Cir.1980) (emphasis in original). Consequently, the movant *in limine* has the burden of establishing that the evidence sought to be excluded on relevancy grounds is *not* relevant to *any* issue in the case. It is not enough to establish that the evidence *is* relevant to an issue which is *not* part of the case. Accordingly, none of the three motions discussed herein can be granted in full.

### A. *Evidence of Aiding and Abetting/Conspiracy to Commit Fraud*

 Although Chrysler has not adequately pled a "conspiracy to defraud" claim against Whitney, it does not necessarily follow that evidence relevant to aiding and abetting or conspiracy to commit fraud is inadmissible. Such evidence may be probative of other propositions.

In its July 1, 1992 Order and Reasons, the Court held, among other things, that Chrysler needed to establish that Whitney engaged in fraudulent, collusive or otherwise unfair behavior outside the course of its ordinary business (1) to overcome Whitney's defense under La.R.S. 6:317 and the common law that it had no obligation to inquire into the source of deposited funds, and (2) to avail itself of the equitable tracing remedy. Consequently, evidence that Whitney conspired with TOJ to conceal TOJ's "out of trust" position *is* relevant to Chrysler's conversion claim.

Accordingly, Whitney's Motion to Strike will be granted as to Chrysler's failure to adequately plead a fraud claim, but denied as to the admissibility of fraud evidence.

### B. *Evidence of Chrysler's Comparative Negligence*

 Chrysler has filed a motion *in limine* to exclude any evidence of alleged comparative fault.

Chrysler points out that all of its remaining claims in this litigation are intentional tort claims: (1) conversion, (2) conspiracy to breach fiduciary duty, and (3) conspiracy to convert. Chrysler notes that comparative negligence is not a defense to an intentional tort. *See, e.g., Broussard v. Lovelace,* 610 So.2d 159, 162 (La.App. 3d Cir.1992) (comparative negligence not a defense to conversion claim).

Whitney all but concedes that the defense of comparative negligence is unavailable,[11] but contends that Chrysler's negligence in its dealings with TOJ is relevant to the issue of "causation."

Whitney is correct that evidence probative of comparative negligence might also be probative of a relevant proposition, and, thus, be admissible. However, Whitney has not attempted to explain its doubtful contention that Chrysler's negligence is relevant to causation. It would be helpful if Whitney could cite one intentional tort case in which a plaintiff's negligent act, making the defendant's intentional tort possible, was deemed relevant.

Although it appears doubtful that Chrysler's negligence is relevant to the issue of causation, it may be relevant to the issue of consent,[12] or other issues not discussed by the parties in their memoranda. In light of this possibility, Chrysler's motion *in limine* will be granted as to the availability of the comparative negligence defense, but denied as to the admissibility of comparative negligence evidence. Such evidence will be evaluated as it is presented.

---

11. Whitney states that it "does not concede" this point, but has not attempted to cite any contrary authority.

12. *See* July 1, 1992 Order and Reasons for Ruling, 798 F.Supp. at 1248.

## C. *Evidence of Whitney's Violation of Bank Practices, Banking Regulations and Statutes, Etc.*

■ Whitney seeks to "Exclude the Introduction of Evidence at Trial with Respect to Allegations that Whitney Allegedly Violated Bank Practices and/or Federal Banking Regulations and Statutes." A number of contested issues of fact listed in the Pre-Trial Order, inserted by Chrysler, concern whether Whitney violated any such customs or rules.

Whitney points out that it had no duty to warn Chrysler, or anyone else, as to the financial condition of its depositor, TOJ. *See, e.g., St. Bernard Savings & Loan v. Robin Seafood, Inc.,* No. 91–4655, 1993 WL 21328 at *3, 1993 U.S. Dist. LEXIS 865 at *8 (E.D.La. Jan. 25, 1993); *Commercial National Bank v. Audubon Meadow Partnership,* 566 So.2d 1136, 1140 (La.App.2d Cir.1990). Whitney also cites authorities suggesting that Chrysler does not have a cause of action arising from Whitney's failure to detect a check kiting scheme, *Cumis Ins. Soc., Inc. v. Windsor Bank and Trust Co.,* 736 F.Supp. 1226, 1232–33 (D.Conn.1990), violation of its own internal policies, *Schaller v. Marine National Bank of Neenah,* 131 Wis.2d 389, 388 N.W.2d 645 (1986) or violation of federal statutes and regulations, *Blaney v. Florida National Bank at Orlando,* 357 F.2d 27, 29 (5th Cir. 1966).

Chrysler concedes that it does not have a claim against Whitney based on Whitney's alleged violation of bank practices, regulations or statutes. However, Chrysler contends that evidence of such violations is relevant to all three of its remaining claims: (1) conversion, (2) conspiracy to breach fiduciary duty, and (3) conspiracy to convert.

As noted above, the Court has held that the issues of whether the transactions between Whitney and TOJ were in the normal and ordinary course of business is relevant to Chrysler's conversion claim. Consequently, at least some evidence of Whitney's deviation from its own policies and industry norms will be relevant.

The conduct of Whitney giving rise to Chrysler's conversion claim—the extension of overdraft credit and the setoff of the TOJ account—is the same conduct giving rise to its conspiracy claims. Whether Whitney deviated from its own practices and industry norms is relevant to whether it conspired with TOJ to commit (a) tortious act(s). Lending and setoff practices which *coincidentally* facilitate a tortious act of the depositor can hardly be deemed evidence of a conspiracy. However, lending and setoff practices *designed* to further a tortious act of the depositor would indicate a conspiracy. Whether such practices were conducted in the usual course of Whitney's business, or were a substantial deviation from Whitney's ordinary practices, is probative of whether Whitney intentionally, or coincidentally, assisted TOJ's alleged tortious conduct. If Whitney's actions were consistent with all relevant rules and customs, it would raise serious doubts about Chrysler's conspiracy claims. *See, e.g., Bane v. Sigmundr Exploration Corp.,* 848 F.2d 579, 581–82 (5th Cir. 1988) ("[T]he routine extension of a loan does not amount to substantial assistance" for purposes of aiding and abetting securities fraud). If Whitney's actions represented a deviation from relevant rules and customs, it would support Chrysler's allegation of a conspiracy.

Of course, it does not necessarily follow that every example of deviation from normal banking practices or "bad" conduct by Whitney is relevant. The Court will examine such evidence as it is offered, both as to its relevance under Rule 402, and as to its possible prejudice under Rule 403. Accordingly, Whitney's motion will be granted inasmuch as the Court has held that Chrysler does not have a claim based on Whitney's alleged violation of banking customs and rules, but denied as to the admissibility of such evidence.

## VI. EXPERT TESTIMONY

### A. *Alford C. Sinclair*

Chrysler has listed Alford C. Sinclair as an expert witness on banking practices. Sinclair, in his expert report, concludes that Whitney's officers were "engaged in reckless and extraordinary banking practices in their relationship with" the Normands and TOJ.

Whitney has challenged the admissibility of Sinclair's and testimony on three grounds: (1) qualification, (2) methodology, and (3) relevancy.

### 1. Qualification

██ Fed.R.Evid. 702 provides:

If scientific, technical or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

Sinclair has thirty years of experience working as a commercial banker, has experience making and supervising floor plan loans, has been president of banks in Tennessee and Florida, has a graduate degree in banking, is currently an officer and director of a bank in Jacksonville, Florida, has lectured on commercial lending topics, published several articles in banking industry publications, and has qualified as an expert witness on commercial banking in a number of courts. There can be little doubt that Sinclair is qualified to testify about commercial lending practices.

Whitney contends that Sinclair lacks familiarity with local banking practices, and, in particular, local banking practices in 1990. However, Whitney has not even attempted to explain how banking practices are different in New Orleans than they are in Florida and Tennessee, or how banking practices here are different now than they were in 1990. Whitney's own banking expert, William Staats, has testified in his deposition that "[g]eographical distinctions don't matter" when determining "normal and usual customary ... practices for prudent banking." Staats dep., pp. 68–69.

It is clear that expert testimony will "assist the trier of fact" in this case. As the Court noted in its Order and Reasons of June 30, 1992, there is a factual question as to whether Whitney was engaged in "ordinary and normal banking transactions" with TOJ when it set off TOJ's account. It will be difficult for lay persons to make such a determination without the benefit of expert testimony.

### 2. Methodology

██ In reaching his conclusion, an expert witness must use "a well-founded methodology or mode of reasoning, one 'sufficiently established to have gained general acceptance in the particular field in which it belongs.'" *Christophersen v. Allied–Signal Corp.*, 939 F.2d 1106, 1111 (5th Cir.1991), *quoting Frye v. United States*, 293 F. 1013, 1014 (D.C.Cir.1923).

Sinclair's methodology was to review the records of Whitney, TOJ, and Hibernia National Bank (TOJ's former floor plan lender) and the depositions of various witnesses deposed in connection with this litigation, and to evaluate the Whitney–TOJ banking relationship based on his own experience and expertise.

Whitney points out that Sinclair describes as "extraordinary" and "fraudulent" several of Whitney's practices, without describing what a "prudent" banker would have done in the same situation. In this sense, Whitney is correct that Sinclair's opinions are largely "based on the premise that 'when I was a banker, I would not have run my business that way.'" Sinclair's report would be much more persuasive if he had juxtaposed Whitney's practices against "ordinary" or "prudent" practices, rather than simply concluding that Whitney's practices were not "ordinary" or "prudent."

Nonetheless, it cannot be said that Sinclair's testimony fails to meet the threshold of admissibility. Unlike certain medical and scientific procedures, there is no mechanical formula for determining whether a particular banking practice is conducted in the ordinary course of a business. In fact, it is hard to conceive of another methodology other than to compare the bank's practices with the expert's own understanding, based on experience, of conventional banking practices. Whitney's banking expert, William F. Staats, used precisely the same methodology. *See* Staats dep., pp. 60–61.

### 3. Relevancy

Whitney contends that Sinclair's proposed testimony is irrelevant. However, the Court has held that evidence of whether (1) Whitney's practices were part of the normal and

ordinary course of its business, and (2) whether Whitney was engaged in fraudulent, collusive or otherwise unfair behavior, are relevant to Whitney's defense under La.R.S. 6:317 and the availability of the equitable tracing remedy. Accordingly, Sinclair's testimony, as well as Staats', is quite pertinent.

### B. *Daniel V. Dooley*

The opinions expressed in Daniel Dooley's expert report can be summarized as follows: (1) The TOJ overdrafts were chronic, (2) Whitney had a large stake in its relationship with TOJ, (3) TOJ was not creditworthy, and (4) TOJ may have operated a check kiting scheme. In addition, Dooley performs an analysis of the proceeds that can be traced to the sale of TOJ's new car inventory.

Whitney contends that Dooley is not qualified, that his opinions contain impermissible legal conclusions, that his methodology is fatally flawed, and that his opinions are irrelevant.

### 1. Qualification

■ Dooley is an accountant with Price Waterhouse in New York. Dooley has testified in his affidavit that he has extensive experience in the area of floorplan financing, including "accounting for floorplan loans, tracing proceeds from floorplanned inventory sales and analysis of floorplan transactions." Dooley aff., ¶ 2. This includes experience as a court-appointed investigator into the nation's largest floorplan fraud, and as an auditor for various floorplan financers. *Id.*, ¶¶ 3–4. He has also testified that he has experience as a consultant on lending practices, including

> allowance for loan loss controls, procedures, policies and systems; strategic planning for financial institutions; special assignments to review and evaluate credit quality and loan losses in loan portfolios; design and implementation of credit reviews; forensic accounting and various investigations.

*Id.*, ¶ 6. He has performed these services for major banks, credit associations and governmental organizations. *Id.*, ¶¶ 5, 8–12. Dooley is clearly qualified to render expert opinions in the areas of floorplan financing and lending practices.

### 2. Legal Conclusions

Fed.R.Evid. 704(a) provides that an otherwise admissible expert opinion is "not objectionable because it embraces an ultimate issue to be decided by the trier of fact." However, this rule "does not allow witnesses to render conclusions of law." *Smogor v. Enke,* 874 F.2d 295, 296 (5th Cir.1989); *Owen v. Kerr McGee Corp.,* 698 F.2d 236, 240 (5th Cir.1983).

Whitney contends that two opinions expressed by Dooley, one in his report and one in his deposition testimony, are in the nature of legal conclusions, and should be excluded from evidence.

■ During Dooley's deposition, he was asked whether he thought Whitney had a duty to disclose to Chrysler the status of TOJ's finances. He responded that he thought Whitney should have so informed Chrysler, as a matter of sound business practice. Of course, Dooley cannot testify that Whitney had a legal obligation to inform Chrysler of TOJ's status. In addition to being an incorrect statement of the law, it is an impermissible legal conclusion by a witness. However, Dooley's testimony that Whitney should have informed Chrysler as a matter of sound business practice does not contain a legal conclusion, and will not be excluded on that ground.

■ Dooley concluded in his expert report that "$1,589,969.14 of proceeds from vehicles furnished by Chrysler Credit Corporation and sold out of trust by TOJ were converted by Whitney to recover overdraft extensions of credit." Dooley will not be permitted to testify that Whitney "converted" anything—the jury will determine that matter after receiving instruction from the Court. However, this does not preclude Dooley from performing his tracing analysis. Dooley may testify as to what amount of the funds setoff by Whitney "constitute the proceeds of Chrysler's collateral" or are "derived from the sale of TOJ's new car inventory," etc.

### 3. Tracing Methodology

In his expert report, Dooley describes his tracing methodology as follows:

1. Proceeds from 176 "sold out of trust" vehicles were identified by date of deposit into TOJ operating account by Chrysler Credit auditors.

2. Daily beginning and ending balances in the TOJ operating account were recorded for each day that "sot" proceeds were deposited.

3. The following criteria were applied each day to determine the amount of the "sot" deposit that was converted by Whitney National Bank to reduce an existing overdraft:

 a. if beginning balance was greater than zero, no proceeds were converted;

 b. if beginning balance *and* ending balance were less than zero, all "sot" deposits on that day were converted to reduce the overdraft;

 c. if ending balance was greater than zero, then:

 if beginning balance was less than zero *and* "sot" deposits were less (in absolute value) than the amount of overdraft, the entire deposit was converted to reduce the overdraft;

 if beginning balance was less than zero *and* "sot" deposits were greater (in absolute value) than the amount of overdraft, an amount equal to the overdraft (in absolute value) was converted to reduce the overdraft;

 d. For the period when Whitney no longer funded overdrafts (September 26–28), the lowest intermediate balance rule was applied.

Whitney contends that Dooley's tracing methodology is fatally flawed. Whitney points out that most of the overdrafts were a direct result of payments to Chrysler, and contends that Dooley should have deducted payments to Chrysler from his "converted proceeds" figures. Chrysler responds that it never received payment for the 176 "sot" units, and, thus, a "credit" for any payments it received is inappropriate.

Chrysler's point is well-taken. The payments Chrysler received were the proceeds of earlier sales of new motor vehicles. Whitney would only be entitled to a credit for those payments if Chrysler was attempting to recover the proceeds of the sale of those vehicles. *See* July 1, 1992 Order and Reasons, 798 F.Supp. at 1248.

### 4. Relevance

#### a. *"Overdrafts Were Chronic"*

Dooley's proposed testimony that the TOJ overdrafts were "chronic," as opposed to ordinary, is clearly relevant. However, Sinclair has made the same conclusion in his expert report. The Court will not allow cumulative expert testimony. Sinclair *or* Dooley will testify on this issue.

#### b. *Whitney's Stake in its Relationship With TOJ*

 Whitney's potential exposure from its transactions with TOJ and the Normands is relevant to its motivation to acquire the proceeds of Chrysler's collateral. Thus, Dooley's analysis of Whitney's exposure is relevant.

#### c. *TOJ's Creditworthiness*

 In his report, Dooley has conducted an analysis of the creditworthiness of TOJ. Dooley concludes that TOJ and the Normands were experiencing serious financial difficulties as early as late 1988. Whitney contends that TOJ's creditworthiness is irrelevant to this litigation, noting that Whitney had no duty to disclose TOJ's financial condition to Chrysler or anyone else.

The central issue in this case is the dynamic of the Whitney–TOJ relationship in late 1989—did Whitney (1) conspire with a doomed TOJ to rescuscitate the latter long enough to capture the proceeds of Chrysler's collateral, or (2) simply continue an ordinary banking relationship with its depositor. TOJ and the Normands' financial status as of late 1989 is relevant to whether TOJ was a viable entity with whom Whitney was continuing an ordinary banking relationship, or a dead horse being propped up by Whitney to acquire Chrysler's proceeds.

However, it is irrelevant whether it was prudent for Whitney to undertake its bank-

ing relationship with TOJ. Whitney has not been, and cannot be, sued by Chrysler for making dumb loans. Although some evidence of TOJ's and the Normands' financial status in late 1989 will be admitted, it does not necessarily follow that *all* evidence of their financial status is relevant. The Court will evaluate the relevancy of this evidence as it is presented.

#### d. Check Kite

 Whitney contends that testimony about the alleged TOJ–Whitney–Hibernia check kite is irrelevant. Whitney points out that Chrysler was never harmed by the alleged kite, and that Whitney had no duty to discover, or to disclose, the kite. Chrysler has not responded to Whitney's contentions on this issue. ·

Arguably, the check kite could be relevant as background information on the TOJ–Whitney banking relationship. However, its minimal probative value, if any, is significantly outweighed by its potential prejudicial impact. The alleged check kite did not affect Chrysler, and was unrelated to any collusion or fraud by Whitney and TOJ against Chrysler. In addition, the very term "check kite" connotes a criminal conspiracy, and the introduction of evidence thereof could only serve to confuse the jury or prejudice the defendants. This evidence will not be allowed.

#### e. Tracing Analysis

Dooley's tracing analysis is relevant. If Chrysler prevails on the merits, the Court will determine the appropriate method of tracing the proceeds of Chrysler's collateral and determine Chrysler's damages. The Court may require the assistance of an accountant to perform this task and, if it is determined that Dooley's methodology is the appropriate one, his analysis will be considered.

### VII. CONCLUSION

For the reasons stated above,

IT IS ORDERED:

(1) Whitney's Motion for Reconsideration is DENIED.

(2) Whitney's Motion *in limine* to Withdraw Responses to Plaintiff's Requests for Admission Nos. 16 and 18 is GRANTED.

(3) Chrysler's Motion *in limine* Requesting that Certain Matters Be Deemed Established for Trial Pursuant to Rule 56(d) is DENIED.

(4) Whitney's Motion *in limine* to Strike Certain Portions of the Pre–Trial Order and to Prohibit the Plaintiff from Introducing Evidence of Aiding and Abetting or "Conspiracy" to Defraud is GRANTED in part and DENIED in part.

(5) Chrysler's Motion *in limine* to exclude any evidence of alleged comparative fault is GRANTED in part and DENIED in part.

(6) Whitney's Motion *in limine* to Exclude the Introduction of Evidence at Trial with Respect to Allegations that Whitney Allegedly Violated Bank Practices and/or Federal Banking Regulations and Statutes is GRANTED in part and DENIED in part.

(7) Whitney's Motion *in limine* to Exclude the Expert Report and Testimony of Alford C. Sinclair is DENIED.

(8) Whitney's Motion *in limine* to Exclude the Expert Report and Testimony of Daniel V. Dooley is GRANTED in PART and DENIED in PART;

IT IS FURTHER ORDERED that the following motions, to which Whitney has not yet responded, will be decided on memoranda on April 28, 1993. Whitney's opposition memoranda are due on April 26, 1993.

(9) Chrysler's Motion to Amend the Court's June 30, 1992 Order and Reasons for Ruling Based on Newly Discovered Evidence.

(10) Chrysler's Motion *in limine* Requesting that the Pre–Trial Order Stipulations of Louis J. Normand, Sr. Be Read to the Jury.